**Norwood SLOAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–892.**

District of Columbia Court of Appeals.

Argued June 26, 1986.

Decided June 29, 1987.

■■■

---

chemical), D.C.Code § 22–502 (1981), and one count of malicious disfigurement while armed, D.C.Code §§ 22–506, –3202 (1981). After a jury trial, appellant was convicted of one count of assault with a dangerous weapon (corrosive chemical), and acquitted on the other charges. Appellant was sentenced to serve a term of imprisonment of not less than forty months nor more than ten years, and to make restitution in the amount of $6,000.

Appellant contends that the trial court failed to instruct the jury properly on the law of self-defense. Appellant also asserts that the trial court violated his sixth amendment confrontation rights by allowing the government to impeach his testimony with the use of a prior inconsistent statement obtained in cross-examination of a defense witness, Detective Hayes, in questioning that exceeded the scope of appellant's direct examination of that witness. Appellant also contends that during sentencing the trial judge violated the Code of Judicial Conduct by relying upon an *ex parte*, post-verdict discussion by his law clerk with a juror about the jury's reasons for acquitting the appellant on two of the three filed charges. He then asserts that the trial court violated his right to procedural due process by ordering $6,000 in restitution without making any factual findings. We affirm the conviction, but remand for resentencing to give the trial court an opportunity to make factual findings on the issue of restitution.

Maureen T. Cannon, Public Defender Service, with whom James Klein, Public Defender Service, and Jennifer P. Lyman, Public Defender Service, were on the brief, for appellant.

Daniel S. Friedman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr. and Mark H. Dubester, Asst. U.S. Attys., were on the brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

PER CURIAM:

Appellant was charged in a three-count indictment with two counts of assault with a dangerous weapon (bottle and corrosive

# I

## Factual Background

### A.

### The Government's Evidence

On the afternoon of October 15, 1983, appellant struck complainant Steve James on the head with a soda bottle following a verbal altercation. Later that evening, James hit appellant twice with his fist. Two days later, on the afternoon of October 17, appellant assaulted James for the second time, and disfigured him, by throwing lye in his face.

At the time of the offenses, complainant and appellant were both employed as shelter coordinators at the Blair Shelter for homeless men, located at 611 Eye Street, N.W. At approximately 4:00 p.m., on October 15, 1983, appellant arrived and signed in for work. Appellant, complainant, and two co-workers, Steven Spells and Samuel Makins, then left to get some beer. Upon returning from the store, the men sat in James' car and drank the beer when James and appellant began to discuss raising children. Someone in the car then commented that appellant had a "nice looking" daughter. Appellant then became hostile toward James, according to James and both witnesses.[1] After asking appellant to get out of his car, James exited the car to allow appellant, who was seated behind him, to get out. As appellant and James stood facing each other next to the driver's door, appellant lit a match and burned a hole in James' jacket. James then pushed appellant away. Appellant reached into the back of the car, grabbed a soda bottle, and hit James on the head, shattering the bottle and causing a cut on James' head. James then grabbed appellant, wrestled him to the ground and pinned him there until their supervisor, Herman McAlister, came out of the shelter and pulled them apart.

Near the end of the shift, at approximately 11:45 p.m., Curtis Brown and appellant, who were both outside the shelter, went back inside, signed out, and left the shelter together. When they walked outside, James was standing next to his car, and appellant called to him. Brown then returned to the shelter, observing James walking towards the appellant as he did so. When James approached appellant and asked what he wanted, appellant swung at him. James returned the blow, striking appellant in the mouth and knocking him down. Appellant then got up and rushed at him, but James again punched him and knocked him to the ground. James then

got in his car and drove away. When Brown came back outside a few minutes later, he observed that appellant was lying on the ground bleeding from the mouth, and had four false teeth knocked out. Brown helped him inside, and an ambulance was called.

Two days later, on October 17, at approximately 4:00 p.m., James arrived at the shelter, signed in, and went to talk to shelter coordinator Clayton Montgomery. After a brief time, James, Montgomery, and others went outside together. Four shelter coordinators—James, Montgomery, Makins and Brown—then gathered around supervisor McAlister's car in front of the shelter. The men stood facing each other and talked for ten to twenty minutes at which time appellant came out of the building and walked toward them.

Appellant, carrying a bag, walked within approximately two feet of James, stood directly in front of him, and with an underhand shoveling motion threw a liquid from the bag into James' face. According to witness Makins, appellant called James several obscene names as he threw the liquid at him, and then threw the jar in which the liquid was contained at James.[2]

James' face, according to testimony, then began "bubbling" and his skin started "peeling" off. James then began to scream in pain and was led inside where his face was flushed with water. He was later taken to the hospital, where he remained for ten days. Despite plastic surgery, his face remained scarred and discolored. The treating plastic surgeon testified that James' face would never have a normal appearance again.

The government also presented evidence that appellant had purposely emptied a mayonnaise jar and refilled it with lye. Shortly before 4:00 p.m. on the afternoon of October 17, the shelter supervisor, McAlister, had encountered appellant on an upper floor of the shelter building. Appel-

1. The two witnesses at this point were Spells and Curtis Brown, another shelter coordinator, who had come out of the shelter during the conversation and was leaning in the passenger window. Makins went into the shelter during the conversation.

2. James testified he had not seen appellant for two days and the other witnesses testified he had not spoken to appellant nor made any gesture toward him during this incident.

lant was looking out a window which overlooked the front of the shelter where James and the other men were standing. A short time later, McAlister saw appellant walk into the shelter's small upstairs kitchen; he then heard water running in the kitchen sink. McAlister later noticed a white substance resembling mayonnaise in the sink. In addition, Makins noticed that a mayonnaise jar that had been in the kitchen refrigerator before the incident was no longer there, and he found the label to a mayonnaise jar lying on the ground where the jar of liquid thrown by appellant had fallen to the ground. After the incident McAlister found a small white container of lye on the steps between the first and second floors of the shelter.

### B.

#### Defense Evidence

Appellant's description of the events leading up to the soda bottle incident on October 15 was substantially identical to that of the government's witnesses, except that, according to him, James said, in obscene terms, that he wanted to have sexual intercourse with appellant's daughter. Appellant denied deliberately striking James with the bottle in the ensuing altercation, but admitted that the bottle landed on James' head during the struggle before he was beaten by James.

Appellant then testified that on the evening of October 15 he left the shelter, and passed by James, who was standing outside. Appellant claimed that James then struck him with "something that appeared to be a hammer." While appellant reaffirmed at trial that only James had assaulted him, appellant also acknowledged telling a detective after the incident that two people had assaulted him. At trial, appellant also denied telling the detective that one man had held him from the rear while the other hit him in the face with "sort of a sock filled with a hard object."

Appellant then testified that after his release from the hospital on October 17, he went to work at the shelter but decided to go home because he was in pain. As he attempted to leave, he observed James with the other coordinators standing in front of the building, with James pounding his fist into his palm. Afraid, he then went back into the shelter to find something with which he could protect himself. Appellant claimed that he went upstairs, picked up a jar of cleaner, put it in a bag and attempted to leave the shelter again. James then approached him, screaming obscenities, and, according to appellant, "started after" him. Appellant claimed he then threw the liquid in the jar at James to keep him away.

Several defense witnesses described appellant's injuries from the incident on October 15. The final defense witness, Detective Harry Hayes, then related that he spoke to appellant on October 16 in the course of investigating James' assault on appellant, and testified to appellant's condition at that time. After several questions calling for inadmissible hearsay and prior consistent statements,[3] counsel had no further questions. After announcing that he had no cross-examination, however, the Assistant United States Attorney approached the bench and advised the court that he wished to complete his impeachment of appellant by eliciting from Detective Hayes what appellant had told the detective about the assault on the evening of October 15. The court ruled the questioning to be within the scope of cross-examination and the prosecutor proceeded. According to the detective, appellant called the detective on the evening of October 16, and described the incident of the night before. Appellant told Hayes that as he walked past James, James grabbed him from behind, and a second man approached and hit appellant with an object wrapped in a sock.

### II

Appellant contends the court made two errors in its self-defense instructions: first,

---

3. Defense counsel asked Hayes if appellant's doctor had told him that appellant was attacked with a hammer and later attempted to elicit from Hayes what appellant had told the detective about the incident involving the soda bottle. The court ruled that the former question called for inflammatory hearsay and the latter an inadmissible prior consistent statement.

by refusing to give the specialized "false appearances" instruction; second, by modifying the "past violence by complainant" instruction.

## A.

Appellant claims he threw the liquid at James because he thought James was going to attack him. James and the government's witnesses contradicted this testimony. The jury therefore had to decide whether appellant truly believed he was in danger, and if so, whether that belief was reasonable. Appellant asked the trial court to instruct the jury:

> If the defendant actually believed and had reasonable grounds to believe that it was necessary to use force to prevent imminent bodily harm to himself, he [or she] would have been justified in using a reasonable amount of force even though it may afterwards have turned out that the appearances were false.

Criminal Jury Instructions for the District of Columbia, No. 5.15(A) (3d ed. 1978) ("Self Defense—Amount of Force Permissible Where Appearances are False"). Appellant claims that this modified instruction on "false appearances" was crucial for the jury's proper evaluation of his self-defense claim.

The court gave the standard self-defense jury instruction in use in the District of Columbia, which provides that a defendant has the right to use force to defend himself if he actually believes he is in imminent danger, and has reasonable grounds for that belief. This instruction admonishes the jurors that it does not matter whether they believe in retrospect that the use of force was necessary, so long as the defendant actually believed he was in danger, and that belief was reasonable under the cir-

cumstances as they appeared at the time. Criminal Jury Instructions, *supra*, No. 5.13 ("Self Defense—General Considerations").[4] This instruction takes into account the importance of the subjective appearance of the situation to the defendant at the time he or she acted, and the possibility that the defendant may be wrong in his or her perception of the situation.

■ The false appearances instruction, No. 5.15(A), may be warranted where there is conflicting evidence of danger to the defendant. The use of instruction No. 5.15(A) would be redundant in this case, however. It emphasizes the significance of the victim's "personal perceptions" which "may justify the use of reasonable, including deadly, force in self-defense," *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984). This point is already discussed in general instruction No. 5.13, which provides that the key question to be addressed by the jury is "whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he was in imminent danger of bodily harm, and could reasonably hold that belief."

The instructions, taken in their entirety, therefore sufficiently covered the legal principles raised by appellant's testimony that James placed him in fear of bodily harm. *Carter v. United States*, 475 A.2d 1118, 1123 (D.C.1984), cert. denied, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *Montgomery v. United States*, 384 A.2d 655, 661 (D.C.1978). Since the "court's charge adequately focused the jury's attention on the self-defense issue," *McPhaul v. United States*, 452 A.2d 371, 374 (D.C.1982), the court's refusal to give

---

4. Instruction 5.13 provides:

> Every person has the right to use a reasonable amount of force in self-defense if (1) he actually believes he is in imminent danger of bodily harm and if (2) he has reasonable grounds for that belief. The question is not whether you believe, in retrospect, that the use of force was necessary. The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he was in im-

minent danger of bodily harm, and could reasonably hold that belief.

> The defendant is not required to prove that he acted in self-defense.

> Where evidence of self-defense is present, the Government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the Government has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty.

instruction No. 5.15(A) did not constitute error.

## B.

Appellant also complains about several modifications of instruction No. 5.18(A)(1), the "past violence" instruction. At trial, defense counsel requested instruction No. 5.18(A)(1), relating to past specific acts of violence committed by complainant against appellant. This instruction was to apply only to the lye-throwing incident, and was to be based on James' beating of appellant on the evening of October 15. The prosecutor requested that the instruction be modified to refer to past violence by either against the other, in light of the soda bottle assault on the afternoon of the 15th, and the conflicting testimony about the assault on the evening of the 15th. The court agreed, and defense counsel objected. The court told the jury that it could consider evidence of past violence *between* the complainant and defendant, instead of just past violence *by* the complainant, as instruction No. 5.18(A)(1) provides.[5]

The court instructed the jury:

Now, there has been evidence adduced regarding previous acts of violence between the complainant, Mr. James, and the defendant, Mr. Sloan, which were, of course, shown by the defendant Sloan. You may consider such evidence or which of the versions of them you find as facts bearing on the reasonableness of the defendant's fear for his health and safety in his claim of self-defense for the October 17, 1983, incident. You may also consider such evidence as bearing on the question of whether the complainant, Mr. James, threatened the defendant Sloan with imminent bodily harm. That is other than the question of who was first the aggressor in the October 17, 1983, incident.

The principal modification of instruction No. 5.18(A)(1) here, changing past violence *by* the complainant to past violence *between* the complainant and defendant, was a sensible adaptation of the instruction to a case in which there was evidence of past violence on both sides. The instruction did not withdraw from the jury's consideration the past violence of complainant toward appellant, nor unfairly minimize or dilute it. Appellant had presented evidence that James had assaulted him on the evening of the 15th. James had presented evidence that appellant had started that fight, and had also assaulted James with a soda bottle on the afternoon of the 15th. In its modified instruction, the court was telling the jury that it must decide which version of the evidence it believed. The court's adaptation properly placed appellant's evidence of past violence by James in context, alongside James' evidence of past violence by appellant against James. Moreover, the court correctly told the jury if it believed appellant's version of the past violence, it could consider this evidence as bearing on the reasonableness of appellant's fear of James, and also on the question of whether James had threatened appellant with harm. In short, this modification, which informed the jury that it must decide which evidence of past violence to credit, was not error.

Appellant also claims that the trial court contradicted itself and confused the jury when it first instructed that evidence of violence "between" appellant and James could be considered on the question of whether the complainant threatened the defendant, but then stated: "[t]hat is *other than* the question of who was first the aggressor." (Emphasis added.) Appellant contends this instruction was inherently self-contradictory and confusing, and appellant submits that the court should have

---

5. Instruction No. 5.18(A)(1) reads:

There has been evidence introduced regarding past acts of violence by the complainant and that these past acts were known by the defendant. You may consider such evidence as bearing on the reasonableness of the defendant's fear for his health or safety. You may also consider such evidence as bearing

on the likelihood that the complainant threatened the defendant with imminent bodily harm, that is, on the issue of who was the aggressor.

Criminal Jury Instructions, *supra,* No. 5.18(A)(1) ("Self-Defense—Past Violence by Complainant or Decedent").

followed the phrasing in instruction No. 5.18(A)(1), which states that such evidence bears "on the likelihood that the [complainant] ... threatened the defendant with imminent bodily harm, that is, on the issue of who was the aggressor." Defense counsel made a generalized objection "to any change from the Red Book," but did not object "stating distinctly the matter to which he object[ed] and the grounds of his objection." Super.Ct.Crim.R. 30. *See Johnson v. United States*, 387 A.2d 1084 (D.C.1978). The court, therefore, was not on particularized notice of any grounds for objection, other than the principal modification discussed above.

■ Because appellant failed to comply with Rule 30, we review the claim under the plain error rule, which mandates that the asserted error raised initially on direct appeal will constitute reversible error only where the error is so clearly prejudicial to the complainant's substantial rights as to jeopardize the very fairness and integrity of the trial. *Allen v. United States*, 495 A.2d 1145, 1151–54 (D.C.1985); *Watts v. United States*, 362 A.2d 706, 708 (D.C. 1976) (en banc). Although the instruction used here may have been a bit confusing, the same instruction told the jury to consider past violence evidence both as it might bear on the reasonableness of appellant's fear of the complainant, and on whether complainant had threatened appellant with imminent bodily harm. Viewed in its entirety, the instruction sufficiently covered the legal principles at issue, *Carter, supra*, 475 A.2d at 1123, and the error, the court's use of the words "other than," did not rise to the level of plain error.

### III

Appellant next contends that the trial court violated his sixth amendment right to confront witnesses by allowing the government to impeach his testimony with his prior inconsistent statement obtained through the government's cross-examination of a defense witness, Detective Hayes,

by questioning that exceeded the scope of appellant's direct examination of that same witness.

After defense counsel completed her direct examination of Detective Hayes, the prosecutor declined to cross-examine the witness, but asked to recall Hayes for rebuttal. The court replied, "I don't see why you can't do it on cross-examination right now with leading questions and everything. We can save some time." Defense counsel interjected that if the prosecutor was going to call Detective Hayes to delve into new areas, "then he cannot use cross-examination." After some discussion, the court noted that defense counsel could ask Hayes other questions on redirect examination.

On direct examination, defense counsel asked Detective Hayes about his conversation with appellant on the afternoon of October 16. She asked Hayes if he had spoken to appellant "about an incident involving appellant and Mr. James at about four o'clock on the, I guess, 15th of October, 1983?" The prosecutor, during cross-examination, asked Hayes if appellant had reported to him how he came to be injured. In response, Hayes testified that appellant told him that he had been attacked by two men.

After the prosecutor completed his cross-examination, defense counsel argued (1) that the scope of the prosecutor's cross-examination exceeded defense counsel's direct examination; and (2) that she should not be restricted to redirect examination, but should be allowed to "cross-examine this witness on this particular issue since the Government is bringing in the statement." The court refused, stating, "I have no justification for you to cross-examine the witness that you called." Defense counsel further argued that the prosecutor, in effect, conducted his own "direct examination" of the witness, and that she should therefore be allowed to "cross-examine" him. The court insisted, however, that she inquire about the statement on redirect.[6]

---

6. On redirect examination, defense counsel inquired whether Hayes asked appellant if he had a police record, whether Hayes had set up an-

other appointment with appellant, and whether he spoke to anyone else while he was talking to appellant. She did not ask any questions relat-

The trial court erred when it restricted defense counsel to redirect examination. The court stated that it wished to save time, but when the government then treated the witness as its own and delved into material beyond the scope of the appellant's direct examination, the court then should have allowed defense counsel to impeach its own witness through cross-examination, at least with respect to the new material brought out by the government.[7] "[T]he prosecution was thus able to introduce evidence that was not subject to constitutionally adequate cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

The court's error, however, is subject to the constitutional harmless error analysis. *Id.* 106 S.Ct. at 1438; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Van Arsdall,* the Court held that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other confrontation clause errors, is subject to the *Chapman* harmless error analysis: "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." 106 S.Ct. at 1438. The Supreme Court noted that a number of factors, all readily accessible to reviewing courts, should be taken into account in deciding whether an error is harmless. They include:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of

cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*

We are also aware that "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Id.* at 1436. With these factors in mind, we conclude that the court's error was harmless beyond a reasonable doubt.

Here, Hayes' testimony was not critical to the government's case. The purpose of the prosecutor's questioning of Hayes was merely to complete impeachment of appellant. Although Hayes' testimony impeached appellant, appellant had admitted half of the inconsistency on cross-examination: despite trial testimony that only one man had attacked him, he acknowledged previously having told Hayes that two men had attacked him. He denied, however, telling Hayes that one man held him from the rear while the other hit him in the face with "sort of a sock filled with a hard object," information relayed by Hayes during the government's cross-examination. Appellant also was impeached with five prior convictions, and an entirely separate prior inconsistent statement to his employer concerning the afternoon incident on October 15.[8]

Moreover, appellant's trial account of the evening incident was corroborated, and his previous statement to Hayes was contradicted by rebuttal witness Patricia Mitchell, who testified that appellant was assaulted by a single man.[9] Mitchell also testified that the man used only his fist, while at

---

ing to the material brought out on cross-examination by the prosecutor.

**7.** Here, the prosecutor's cross-examination was clearly beyond the scope of defense counsel's direct examination. Defense counsel had asked Hayes about the incident on the afternoon of October 15, while the prosecutor asked about the incident which occurred later that night, after the work shift ended. Another indication that defense counsel was referring to the afternoon incident was her question, asked a few moments later, about what appellant had said about the manner in which the complainant

was hit with a bottle. The prosecutor objected to this question, and the court sustained the objection.

**8.** This written statement was furnished to a supervisor after the incident, in which appellant stated that the soda bottle "went up in the air" during the struggle with James and landed on James' head.

**9.** At trial appellant testified that the second man merely stood nearby.

trial, appellant claimed James struck him with "something which looked like to me to be a hammer."

Appellant claims that because of the court's ruling denying him cross-examination, he was prevented from eliciting two types of information: (1) information about the circumstances of appellant's statement to Hayes, including appellant's condition at the time, and (2) prior consistent statements by appellant to Hayes about how he was injured on the night of October 15.

We find that appellant was not entirely prevented from eliciting the first type of information. In fact, appellant's counsel did elicit at least some information about appellant's condition during the direct examination of Hayes: Hayes testified that the first time he tried to speak to appellant on October 16th, appellant's condition prevented him from speaking to Hayes, and when Hayes did speak with him by telephone later that day, appellant said "he felt okay at that time." During cross-examination by the prosecutor, Hayes stated that during the phone conversation, appellant seemed coherent, did not ramble, and seemed to "know what he was saying." Thus, the jury had some information about appellant's condition, and defense counsel was not entirely foreclosed from cross-examination. *See Springer v. United States,* 388 A.2d 846, 856 (D.C.1978).[10]

As for the second type of information alleged to have been precluded by the court's ruling, there is no evidence, nor a proffer from defense counsel, that appellant said anything else to Hayes about the incident that would have been consistent with his trial testimony. On the contrary, the prosecutor asked Hayes non-leading questions—"Did he tell you how it was that

he came to be beaten up?" and "What did he say occurred?"—and Hayes gave detailed responses, but his testimony did not contain other elements which were consistent with appellant's trial testimony.

Finally, the prosecution's case against appellant was strong. Several eyewitnesses in addition to James testified, and the evidence of appellant's guilt was compelling. Therefore, utilizing all of the *Van Arsdall* factors, we conclude that although it was error to deny cross-examination in these circumstances, the error was harmless beyond a reasonable doubt.

## IV

Appellant also contends that the trial judge violated the Code of Judicial Conduct by relying on an *ex parte,* post-verdict discussion by his law clerk with a juror about the reasons why appellant was acquitted of two of the three charged offenses. After the verdict was delivered, a juror came to the trial judge's chambers seeking to have the judge place a telephone call to his employer. When the juror asked the judge's law clerk about placing this call, a discussion ensued in which the juror related to the clerk that the jury had acquitted the appellant on the two charges because it misunderstood the court's instructions.[11]

At the start of the subsequent sentencing hearing, the trial court informed both counsel of the conversation, which he termed a "relevant" matter. Defense counsel then asked that the proceeding be delayed, in order to allow her time to speak to the juror in question as well as to other jurors, and to submit affidavits setting forth other jurors' reasons for their verdict. The court declined the request, and imposed sentence.

---

**10.** The Supreme Court's opinion in *Delaware v. Van Arsdall, supra,* modifies the per se error/harmless error dichotomy we outlined in *Springer.* We now assess all confrontation clause error under the harmless error test, *Bassil v. United States,* 517 A.2d 714, 717 n. 5 (D.C.1986), and the "extent of cross-examination otherwise permitted" is one of the factors to be considered in the harmless error calculus.

**11.** According to the juror, appellant was acquitted of the assault with the soda bottle because

the complainant "wasn't injured enough and . . . would have protected himself." He was reportedly acquitted of malicious disfigurement because the jury misunderstood the malice instruction to require proof of the disregard of the life and safety of others in addition to the complainant. The trial court's instruction indicated that "malice is a state of mind, a heart regardless of the life and safety of others" (emphasis added).

Appellant asserts that the information from the juror was improperly obtained and relied upon by the trial court in passing sentence, in violation of the ABA Code of Judicial Conduct.[12]

Canon 3(A)(4) of the Code of Judicial Conduct provides in pertinent part:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

■ Applying this standard to the case at bar, it is clear that the trial court judge did not, either personally or through his law clerk, initiate the *ex parte* communication that occurred in chambers. The juror initiated the discussion with the clerk, and the judge properly informed counsel of the incident, although somewhat belatedly.[13] The trial judge also made it quite clear that he would not consider the contact as he made his sentencing deliberations. The judge stated that the communication made "absolutely no difference whatsover to the sentence I am probably going to impose in this case." The judge repeated this disclaimer twice in the subsequent sentencing proceedings after defense counsel challenged the communication.

Appellant maintains, however, that the court demonstrated its consideration of the *ex parte* communication by indicating that it would revise some of its future jury instruction procedures as a result of the confusion the juror reported.[14] While the juror's communication confirmed the trial court's suspicions that the jury misunderstood his instructions, his consideration of this information was strictly limited to future application, not the present case. The trial court stated explicitly on three occasions that the communication was not a factor in his sentencing determination. Accordingly, we find that the trial court's future utilization of the remarks is not consideration of an *ex parte* communication "concerning a pending ... proceeding" as is proscribed by Canon 3(A)(4) of the Code of Judicial Conduct.[15]

We are mindful, however, that an appearance or perception of impropriety can be damaging to public confidence in our judicial system, even though no violation of rights has occurred. In general, contacts with the court by counsel or other persons are strongly discouraged, except in instances where adequate notice and opportunity to respond is given to all parties.[16] Yet we also recognize that a variety of responses to such contacts may be appropriate, depending on the circumstances. If a trial judge personally engages in an *ex parte* communication or obtains *ex parte* information that renders him unable to function as an impartial adjudicator, recusal may be necessary. In other circumstances, such as the instant case, indirect and accidental receipt of non-prejudicial *ex parte* information may be satisfactorily addressed by notification to counsel of the communication. Given the circumstances presented, we conclude that the trial court's response did not

---

**12.** The ABA Code governs the conduct of judges of the District of Columbia. *In re Evans,* 411 A.2d 984, 996 (D.C.1980); *In re Bell,* 373 A.2d 232, 235 (D.C.1977).

**13.** The court did not notify counsel until the start of the subsequent sentencing proceeding.

**14.** Judge Wolf merely indicated that he would take the juror's remarks into account in connection with future general jury instructions. He stated that he had revised some of his jury instructions to avoid confusion of the type that the juror related. He also indicated that he would hesitate to send taped jury instructions to future juries, as he did in this case.

**15.** Appellant also cites the trial court's imposition of the maximum sentence as further evidence that the juror's explanation for the acquittals was improperly relied upon by the court, in violation of his right to due process of law. This contention is unsupported by any evidence in the record. Moreover, the trial court has broad discretion in the matter of sentencing. *McPhaul v. United States,* 452 A.2d 371, 374 (D.C.1982).

**16.** *See* American Bar Association Standards for Criminal Justice Relating to the Special Functions of the Trial Judge, Standard 6–2.1 (2d ed. 1982 Supp.).

constitute an abuse of the broad discretion it has in dealing with matters of this sort.[17]

## V

Appellant's final contention is that the trial court violated his right to procedural due process when it ordered him to pay $6000 in restitution to Mr. James. The trial court ordered the payments to be made at the rate of $50 per month, beginning six months after appellant's release from prison. Appellant attacks the court's restitution award on two grounds: (1) that the court failed to make findings of fact to support its award; and (2) that the authorizing statute, D.C.Code § 16–711 (1981 & 1986 Supp.), does not authorize restitution for pain, suffering or disfigurement, damages which the trial court used as a basis for its award.

Enacted in the Sentencing Improvements Act of 1982, D.C.Code § 16–711 provides:

(a) In criminal cases in the Superior Court, the court may, in addition to any other sentence imposed as a condition of probation or as a sentence itself, require a person convicted of any offense to make reasonable restitution or reparation.

(b) When restitution or reparation is ordered, the court shall take into consideration the number of victims, the actual damage of each victim, the resources of the defendant, the defendant's ability to earn, any obligation of the defendant to support dependents, and other matters as pertain to the defendant's ability to make restitution or reparation.

(c) The court shall fix the manner of performing restitution or reparation.

(d) At any time during the probation period or period of restitution or reparation, the defendant may request and the court may grant a hearing on any matter related to the plan of restitution or reparation.

Appellant first argues that the court did not make any factual findings with respect to the various factors mandated for consideration by § 16–711(b), and thereby deprived him of procedural due process. At the sentencing hearing, the trial court addressed some of these issues briefly:

[Mr. James has] had medical expenses, obviously. I think I may properly and appropriately take into account pain, suffering and disfigurement. Mr. James indicated that he was going to go file suit against Mr. Sloan, but I don't know whether that will or will not come about. Mr. Sloan will be in jail and it very well could turn out to be a paper judgment.... Mr. Sloan won't be able to carry out any such restitution or reparation while he is incarcerated, but being the man that he is and the way he has advanced himself, I presume that he will be able to continue that when he is released....[18]

The court then set the restitution figure at $6000, stating that this figure was a "mere pittance" that "would most inadequately fail to compensate the complainant ... for his disfigurement."[19]

### A.

Our examination of this issue is guided by the legislative purpose of § 16–711. The Council's stated purpose in adopting the Sentencing Improvements Act was "to promote the use of restitution and commu-

---

**17.** While the trial court's refusal to continue the case for further investigation of the juror's statements was not an abuse of discretion, we note that, given our disposition of this case, *see* section V *infra*, the trial court, on remand, may allow a further investigation of the juror's comments. Indeed, counsel may have undertaken such an investigation already. If the trial court pursues this option, it has the authority, on remand, to reconsider the sentence.

**18.** Before passing sentence and imposing the restitution order, the court again briefly recounted the factors listed in § 16–711(b), but

largely without analysis as applied to appellant: "bearing in mind the actual damage to the victim, the resources of the Defendant which are nil while he's incarcerated, but also bearing in mind the Defendant's ability to earn, but also considering his obligation to support dependents, ... the defendant [is] required to pay ... the sum of ... $6000.00."

**19.** The trial court then noted "that a $100,000.00 verdict would be a small one in a civil proceeding" in this case.

nity service as sentencing options." D.C.Law 4–202, *District of Columbia Statutes-At-Large*, 1981–82 Compilation at 714. *See Davidson v. United States*, 467 A.2d 1282, 1285 (D.C.1983). The Council's Committee on the Judiciary indicates in its commentary on the law that its "primary effect ... will be to increase the sentencing options available to Superior Court judges...." Committee on the Judiciary, Report on Bill 4–120 (November 10, 1982), at 4. The legislative history of the restitution statute therefore indicates that it was not designed to serve as an additional civil remedy for victims of crime, but as a tool for use in sentencing.

■ With this purpose in mind, we recognize the differing objectives of a civil and criminal litigation resulting from injury to a victim. Although we draw no rigid distinctions, the general purpose of a civil tort litigation is to compensate the victim's damages. The purposes of a criminal prosecution, however, include punishment, deterrence and rehabilitation of the offender. While restitution under § 16–711 does have an incidental compensatory effect, the statute is primarily directed at the offender. Section 16–711(b), for example, largely focuses the determination of the award on the offender's ability to make restitution or reparation.

The purpose of restitution as a criminal sentencing option under § 16–711 must therefore be viewed as corrective in nature. *United States v. Braider*, 112 Daily Wash. L.Rptr. 1441, 1445 (D.C.Super.Ct. June 15, 1984). Restitution forces the convicted person to be held accountable for his actions and injuries caused thereby. *United States v. McLaughlin*, 512 F.Supp. 907, 909 (D.Md.1981). Its function serves the corrective ends of punishment, deterrence, and rehabilitation. *United States v. Braider*, *supra*, 112 Daily Wash.L.Rptr. at 1445; Note, *Victim Restitution in the Criminal*

*Process: A Procedural Analysis*, 97 HARV. L.REV. 931, 937–39 (1984) (hereinafter *Victim Restitution*). *See also State v. Harris*, 70 N.J. 586, 362 A.2d 32 (1976).

■ Further, given that the restitution option under § 16–711 was not meant as the equivalent of a civil action but as a sentencing device, no right to a jury trial on the calculation of the award was envisioned.[20] *See Cannon v. State*, 246 Ga. 754, 755, 272 S.E.2d 709, 710 (1980); *People v. Pettit*, 88 Mich.App. 203, 206–207, 276 N.W.2d 878, 880 (1979); *State v. Harris*, *supra*, 70 N.J. at 597, 362 A.2d at 37–38. The award is merely a part of the sentencing proceeding. Therefore, so long as the appropriate due process protections normally required in a sentencing proceeding are afforded, the entire panoply of procedures required in a civil tort action are not necessary. *See People v. Pettit*, *supra*, 88 Mich.App. at 206–207, 276 N.W.2d at 880; *State v. Harris*, *supra*, 70 N.J. at 598–599, 362 A.2d at 38; Note, *Victim Restitution*, *supra*, 97 HARV.L.REV. at 941–44. *See also United States v. Lemire*, 232 U.S.App.D.C. 100, 126, 720 F.2d 1327, 1353 (1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *State v. Lack*, 98 N.M. 500, 506, 650 P.2d 22, 28 (1982).

This approach recognizes that the main purpose of a civil action is to determine the extent of loss and who is liable for it. A precise estimate of damages is therefore critical, and a trial with a high level of procedural safeguards is necessary to ensure an accurate calculation of the loss that the tortfeasor must bear. In a criminal prosecution, however, the societal liability of the accused is the only issue, and upon a finding of guilt the court must impose a penal sanction, which is not necessarily limited or defined by the amount of harm the offender inflicted on the victim. The focus of a criminal action is instead on the act and the offender, and a precise calculation

**20.** Appellant claims, however, that the court's restitution order deprived him of a hearing on the computation of restitution. Yet appellant did not request a hearing in this case. Moreover, § 16–711 by its express terms leaves the decision to grant such a request with the sound discretion of the sentencing judge. Committee on the Judiciary, Report on Bill 4–120, Section-By-Section Analysis, at 6. The statute provides that "the defendant *may* request and the court *may* grant a hearing on any matter related to the plan of restitution or reparation." D.C.Code § 16–711(d) (emphasis added).

of the restitution award is not necessary, since the award is not primarily compensatory, but corrective. *See* Note, *Victim Restitution, supra,* 97 HARV.L.REV. at 945. The discretion of the sentencing judge in fashioning the award therefore controls, so long as there is a factual basis in the record to support the court's determination of the amount of restitution. *State v. Wilson,* 274 S.C. 352, 355–56, 264 S.E.2d 414, 416 (1980); *State v. Harris, supra,* 70 N.J. at 598–599, 362 A.2d at 38. *See also State v. Lack, supra,* 98 N.M. at 507, 650 P.2d at 29.

 While the trial court has wide discretion in sentencing, including its order of restitution, *see United States v. Lemire, supra,* 232 U.S.App.D.C. at 125, 720 F.2d at 1352, "it would have been helpful if the [trial court] made findings of fact elucidating the basis for its monetary assessment" so that we could review its decision-making process on appeal. *Id.* at 127, 720 F.2d at 1354. *See also United States v. Braider, supra,* 112 Daily Wash.L.Rptr. at 1448. We conclude that the trial court made insufficient findings to support its restitution award in the instant case. Therefore, we direct the trial court to make further specific findings of fact, however brief, to support its order, consistent with the directives of the remainder of this opinion.

### B.

 Appellant also asserts that the trial court erred when it ordered him to pay restitution for Mr. James' pain and suffering. Appellant argues that the term "actual damage" in § 16–711(b) does not encompass pain, suffering, mental distress or disfigurement. In general, we agree. Given the corrective nature of restitution as a sentencing device, we find that a victim's damages must be liquidated or easily measurable to form the basis of such an award.

As noted *supra,* a precise calculation of damages is not contemplated in a sentencing proceeding, but is reserved for a civil action. Therefore, we conclude that the term "actual damage" in § 16–711(b) includes known liquidated damages such as medical expenses, lost wages, and other expenses connected with the crime. Section 16–711(b) does not include those damages which are not presently and readily measurable, however, since these can be accurately determined only in a civil proceeding. *See State v. Stalheim,* 275 Or. 683, 552 P.2d 829 (1976); *Biddy v. State,* 138 Ga.App. 4, 225 S.E.2d 448 (1976); *O'Quinn v. State,* 121 Ga.App. 231, 173 S.E.2d 409 (1970).[21]

 Here, the trial court was free to include in its award Mr. James' lost wages and medical expenses, already accrued or reasonably anticipated, but was not free to include undetermined damages, such as his pain, disfigurement, suffering, and anguish resulting from appellant's attack. These damages are generally not properly part of a criminal proceeding, but are left to a more exacting determination in a civil proceeding, where the primary purpose is compensation of the victim. *See State v. Stalheim, supra,* 552 P.2d at 831. Thus, the trial court shall not consider Mr. James' pain, suffering, and disfigurement when it recalculates its award of restitution.[22]

### Conclusion

For all of the foregoing reasons, the judgment of conviction is affirmed and the case remanded for further consideration of the award of restitution, as directed.

*Affirmed; remanded for further proceedings consistent with this opinion.*

FERREN, Associate Judge, concurring in part and dissenting in part:

I concur in the court's opinion except for Part IV, from which I respectfully dissent.

---

**21.** There exists a diversity of views about the proper scope of a restitution award. Other jurisdictions have held that recoverable damages include unliquidated losses. *See State v. Garner,* 115 Ariz. 579, 566 P.2d 1055 (1977); *State v. Morgan,* 8 Wash.App. 189, 504 P.2d 1195 (1973). *See also United States v. Braider, supra,* 112 Daily Wash.L.Rptr. at 1445–46, where the Supe-

rior Court chose to follow these authorities. For the reasons pointed out above, we decline to do so.

**22.** We also emphasize that the restitution award can be used as a set-off against any subsequent civil damage verdict.

## I.

On April 4, 1985, the trial judge's law clerk, and thus the judge, inadvertently received *ex parte* information from a juror. It explained why the jury had acquitted appellant on the charge of malicious disfigurement and revealed that the jury, in doing so, had misunderstood the judge's instructions. The judge disclosed this contact to the parties six weeks later on May 17, immediately before sentencing. He stated that the jury's "interesting distortion of instructions ... explains the jury's verdict to some extent," and he added that, henceforth, he would change, in order to clarify, the instruction on malicious disfigurement. But he also assured everyone concerned that the jury's misunderstanding, leading to the acquittal, "makes absolutely no difference whatsoever to the sentence I am probably going to impose in this case."

Defense counsel responded by requesting a brief continuance to interview the juror, and perhaps other jurors, adding: "And given that the Court says that that explains the jury verdict without having heard from any of the other jurors, I think that it does make a difference in terms of what kind of sentence is to be given." Defense counsel obviously was concerned that the judge might use the information from this one juror, which he apparently credited as true, as a basis for imposing a longer sentence for the assault with a dangerous weapon than he might otherwise have imposed. It is true that a trial judge, in selecting a sentence, is not precluded from considering evidence that related to a charge on which the jury has acquitted. *See United States v. Bernard*, 757 F.2d 1439, 1444 (4th Cir.1985) (citing cases); *United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972); *cf. United States v. Campbell*, 221 U.S.App.D.C. 367, 380, 684 F.2d 141, 154 (1982) (declining to "pursue *Sweig* to its ultimate reading," but affirming trial court's sentence based on evidence relating

to crimes for which defendant was acquitted). Counsel apparently surmised that the judge may be more inclined to do so, however, when he believes the jury itself would have convicted but for a misunderstanding of the court's instructions. Thus, defense counsel understandably sought time to interview the jurors for the purpose of eliciting more complete information—including, possibly, an entirely different report of the deliberations—that might help disabuse the trial judge of any meaningful reliance on the *ex parte* contact.

While I do not at all doubt the trial judge's integrity in the matter, I believe he abused his discretion in denying a continuance for this fact-finding purpose. Counsel had a right to investigate the accuracy of information which the judge, before sentencing, received *ex parte* from a juror through a law clerk. This second-hand information from one juror had impressed the judge enough that he announced he intended, as a result, to revise the standard jury instruction on malicious disfigurement. It follows—to me irresistibly—that defense counsel should have received time to investigate the entire situation, in order to present to the trial court whatever evidence and arguments were available either to assure, after a hearing, that the judge was not influenced by the improper contact in selecting a sentence or, alternatively, to convince the judge to recuse himself given the risk of a psychological taint from such disturbing information.

## II.

But even if defense counsel's proffered reason for a continuance had doubtful potential, given the trial judge's statement that the jury's misunderstanding made "absolutely no difference whatsoever," there was another obvious reason for a continuance: the judge, at the very least, was confronted by the problem of an "appearance" of impropriety.[1]

---

1. The Supreme Court has stated with respect to the similar issue of judicial bias: "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99

L.Ed. 942 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)); *see also Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985) (judge must recuse self from case "whenever there is 'a rea-

This problem of "appearances" was significant, not trivial. After learning that the jurors had acquitted appellant of malicious disfigurement because they apparently had misunderstood his instructions, the trial judge imposed the severest possible sentence for assault with a dangerous weapon. That sentence included not only the maximum imprisonment but also $6,000 in restitution which this court today holds both inadequately justified by findings of fact and unlawfully enlarged to cover pain and suffering. However justified the imprisonment may be, and however reasonable the judge's interpretation and application of the restitution provisions may have been at the time, it unquestionably appears that the trial judge may have "thrown the book" at appellant, within statutory limits, to compensate for a perceived injustice in the acquittal for malicious disfigurement—a perception enhanced by a juror's announced mistake for which the trial judge may have felt responsible.

This appearance of impropriety is all the more serious for two reasons: First, the trial judge waited 43 days to disclose the *ex parte* contact (described by the judge himself as a "relevant" matter), and yet he gave defense counsel only a few seconds at the sentencing hearing, immediately after disclosing the contact, to try to persuade the court of the significance of that contact. Second, the trial judge did not address, and thus may not have been aware of, the appearances problem; as far as one can tell from reading the transcript, the judge disclosed the juror contact only to show the jury's misunderstanding of the instruction, as a matter of general interest, and to state for the record that the judge would not, in fact, be affected by it at sentencing. In a significant respect, therefore, the judge's comments missed the point.

### III.

In sum, the trial judge should have granted the requested continuance to permit counsel not only to explore the prof-

fered basis for it—juror interviews—but also to develop an obvious alternative basis: the appearance of impropriety. There is no reason to assume that, after a hearing for which counsel had been given time to prepare, the trial court's judgment could not have been affected, even to the point of recusal.

Accordingly, I do not agree with the majority that the same judge can now cure this particular problem, on remand, by "allow[ing] a further investigation of the juror's comments" if the court feels it is appropriate. *Ante* at 1288 note 17. Whether or not defense counsel's interviews with the jurors, followed by a hearing on a motion to recuse, would have resulted in a showing of actual prejudice in sentencing, this remand procedure, after all that has happened, would not now be enough to eliminate the appearance of impropriety. I would remand for resentencing by another judge, " 'both for the judge's sake and [for] the appearance of justice.' " *United States v. Ewing*, 480 F.2d 1141, 1142 (5th Cir.1973) (per curiam) (citation omitted).

sonable basis' for a finding of an 'appearance of partiality under the facts and circumstances' of

the case") (quoting *SCA Services, Inc. v. Morgan,* 557 F.2d 110, 116 (7th Cir.1977) (per curiam)).