**Michael D. JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 93–CF–311.

District of Columbia Court of Appeals.

Argued Feb. 2, 1994.

Decided Aug. 8, 1994.

Eli Gottesdiener, Public Defender Service, with whom James Klein and Stephanie Harrison, Public Defender Service, Washington, DC, were on the brief, for appellant.

Cynthia D. Walicki–Chan, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Roy W. McLeese III and John A. Beasley, Jr., Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

Appellant Michael Jackson shot and killed Darnell McKinney in a dispute over appellant's girlfriend. Appellant argued self-defense, asserting that McKinney had pulled a gun on him. Another defense witness testified that, if not a gun, McKinney had pulled out at least a "black object." Appellant was convicted of voluntary manslaughter while armed.

Appellant contends that the trial court committed reversible error by refusing to instruct the jury about the effect of "false appearances" on a self-defense claim. We conclude that although the instruction should have been given, the failure to do so did not constitute reversible error in the totality of the proceedings.

I.

Appellant testified that on June 20, 1991, he was playing basketball near the pool where his girlfriend was swimming. When appellant went home, his mother asked him to go to the store. As appellant approached the store, McKinney, who was with Derrick Miller and Keith Lockett, stepped in front of the doorway. McKinney told appellant he had tried to talk to appellant's girlfriend at the pool, that she was a "nice looking girl," and that appellant did not deserve her. When appellant shrugged and tried to enter the store, McKinney stopped him by putting a hand on appellant's chest. Appellant tried to get past, but McKinney pushed him back, saying, "[Y]ou think you better than me, don't you? ... [Y]ou have a nice girl and your family, you have a nice family and ev-

erything." When appellant again tried to pass, McKinney pushed him and tried to swing at appellant, who moved out of the way. Lockett then told McKinney, "[Y]ou better do what you gotta do, do what you want." McKinney hit appellant two or three times, appellant struggled and McKinney ripped appellant's shirt. Lockett said, "[H]e's too big." McKinney then pulled out of his waistband a gun which appellant described as a "black pistol, semi-automatic," like appellant's gun. Appellant thought that McKinney was going to kill him. He pulled his own gun and started firing "[t]o save [his] life." After appellant shot McKinney he ran home, and at some point he threw away the gun.[1]

David Cautlen, who was on his way to the store at the time of the shooting, corroborated appellant's testimony. He saw appellant trying to go into the store but being stopped by one of the three men outside the store. Appellant and one of the men began pushing each other and came to blows. Cautlen thought the three men were going to "bum rush" or attack appellant. Cautlen saw "the victim go into his shorts and start to pull something black out." The prosecutor asked Cautlen, "Well, it's true, though, that you never saw a gun in Darnell McKinney's hand that night?" Cautlen replied, "No, I seen a black object." When appellant pulled out a gun, Cautlen ran.

The appellant's proposed self-defense instructions included false appearances, with language substantially similar to Instruction 5.15 of the third edition of the Standardized Criminal Jury Instructions for the District of Columbia.[2] The government did not object to the false appearances instruction, but the trial court concluded that the instruction did not seem to be applicable. Appellant's counsel pointed out that Cautlen had testified about a "black object" and that if appellant believed that it was a gun, regardless of whether it was a gun or not, the instruction would be relevant. The court reasoned that because there was no evidence whether or not a gun was found by the decedent and no evidence that the object was later found not to be a gun, "there is no saying that appearances were or were not deceiving." The court decided that the instruction would "unnecessarily confuse the jury, because it simply doesn't apply here."

## II.

It is well settled that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Bostick v. United States*, 605 A.2d 916, 917 (D.C. 1992) (quoting *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988)); *Reid v. United States*, 581 A.2d 359, 367 (D.C.1990) (same); *Adams v. United States*, 558 A.2d 348, 349 (D.C.1989) (same). This is true even if the defendant claims inconsistent or contradictory defenses. *Mathews, supra,* 485 U.S. at 64–66, 108 S.Ct. at 887–88; *Bostick, supra,* 605 A.2d at 917; *Guillard v. United States*, 596 A.2d 60, 62 (D.C.1991); *Gray v. United States*, 549 A.2d 347, 349 n. 2 (D.C.1988); *Womack v. United States*, 119 U.S.App.D.C. 40, 336 F.2d 959 (1964) (per curiam). In reviewing the denial of a requested defense instruction, the evidence must be viewed in the light most favor-

---

1. We present here the facts in the light most favorable to appellant. Prosecution witnesses told a somewhat different story. In particular, McKinney's companions testified that after swinging at McKinney and missing, appellant took a gun out of his waistband. McKinney started running away and appellant shot him several times. On direct examination, Lockett could not remember if McKinney had anything in his hands, but on cross-examination said McKinney did not have a gun. Miller agreed with Lockett's version of events outside the store, but said affirmatively that McKinney did not have a gun.

2. The proposed instruction read:

If [appellant] actually believed and had reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he would have been justified in using deadly force in self-defense, even though it may afterwards have turned out that the appearances were false. If these requirements are met he could use deadly force even though there was in fact neither purpose on the part of the other person to kill him or do him serious bodily harm, nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense.

able to the defendant. *Bostick, supra,* 605 A.2d at 917; *Adams, supra,* 558 A.2d at 349. However, the instructions should not require the jury to engage in "bizarre reconstruction[s] of the evidence." *Bostick, supra,* 605 A.2d at 917 (quoting *Adams, supra,* 558 A.2d at 349; *Wood v. United States,* 472 A.2d 408, 410 (D.C.1984)).

■ In light of these principles, we cannot agree with the trial court's view that no evidence was presented in this case to warrant a defense instruction on false appearances. As defense counsel correctly pointed out at trial, Cautlen's testimony that he saw McKinney pull out a black object that Cautlen could not positively identify as a gun but only as a "black object" was sufficient to satisfy the defense's evidentiary burden for an instruction on false appearances. It was not necessary in addition to this testimony for appellant to present further evidence tending to prove that the object was not in fact a gun.[3]

Appellee argues that, as in *Sloan v. United States,* 527 A.2d 1277 (D.C.1987) (per curiam), the false appearances instruction would be redundant because of the lack of "conflicting evidence of danger to the defendant." 527 A.2d at 1282. In *Sloan,* the evidence presented only two points of view, Sloan's claim that James yelled obscenities and "started after" Sloan so that Sloan needed to defend himself, *id.* at 1281, and the prosecution's view that James was standing outside Sloan's building when Sloan approached, called James obscene names and threw lye at his face, *id.* at 1280. No "false appearances" evidence was presented that James had acted in a manner which Sloan had misinterpreted. However, the facts of this case, viewed in the light most favorable

to the appellant, present just such evidence, namely that McKinney pulled out an object which may not have been a gun but which appellant could have reasonably believed was a gun. In these circumstances, the trial court was mistaken in concluding that the instruction was not applicable in light of the evidence as presented and erred in not giving it as requested.

### III.

■ We do not think, however, that this misapprehension by the trial court constituted reversible error. In making this determination, we are guided by the standard set forth in a prior case also involving the assertion that the trial court refused to give a specific portion of the defendant's self-defense instruction, namely the instruction on the permissible use of nondeadly force to defend oneself, which was supported by the evidence. "[W]e must determine, viewing the instructions and evidence as a whole, whether it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *McPhaul v. United States,* 452 A.2d 371, 374 (D.C.1982) (quoting *Alexander v. United States,* 135 U.S.App.D.C. 367, 371, 418 F.2d 1203, 1207 (1969) (quoting in turn *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946))). Here, as there, the false appearances instruction is not a separate defense theory altogether, but rather simply an elaboration on the principle embodied in the basic self-defense instructions.[4] We also are mindful that here, false appearances was not at the heart of the case.[5]

---

**3.** At trial, there was considerable dispute about whether McKinney had a gun. No testimony was heard regarding whether a gun or other black object was found at the scene. Defense counsel suggested in closing argument that McKinney's companions took the gun when they left the scene after the shooting. The prosecution stressed the fact that no other witnesses testified to McKinney having a gun.

**4.** We thus disagree with appellant's argument that appellant was deprived of the right to have the jury consider one of the two theories of defense available to him, requiring application of

the "beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). This case is unlike *Potter v. United States,* 534 A.2d 943, 946 (D.C.1987) (per curiam), where the jury was simply not told that self-defense applied to one of the charges and a jury question on that issue went unanswered.

**5.** In this regard, it significantly differs from *Williams v. United States,* 131 U.S.App.D.C. 153, 157, 403 F.2d 176, 180 (1968), and *Jones v. United States,* 555 A.2d 1024, 1027 (D.C.1989).

Appellant insisted that he saw a gun and the evidence and argument at trial largely turned on whether McKinney had pulled out any gun at all. See notes 1 and 3 *supra.*

## A.

The court instructed the jury on voluntary manslaughter, mitigation, and self-defense. The jury was told that self-defense was a defense to all three of the homicide charges against appellant and depended upon the circumstances as they appeared to appellant at the time of the incident.[6] The instructions continued by explaining that the amount of force allowable depends upon the circumstances under which appellant acted.[7] The jury was then instructed on imperfect self-defense in the context of voluntary manslaughter.[8]

Appellant argues that by itself, the self-defense instruction was not sufficient to inform a jury that a defendant who relied on false appearances may have been reasonable in using deadly force. However, the instructions are to be examined as a whole. *Carter v. United States,* 475 A.2d 1118, 1124 (D.C. 1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *Mitchell v. United States,* 595 A.2d 1010, 1012 (D.C. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1303, 117 L.Ed.2d 525 (1992). The self-defense instruction directed the jury to consider the events from the defendant's point of view. By focusing the jury on "circumstances as they appear[ed] to [appellant] at

the time of the incident," see note 6 *supra,* the instructions reflected the legal principle that a defendant who was wrong as a matter of fact may nonetheless have been reasonable under the law. *See Sloan, supra,* 527 A.2d at 1282 (citing *McPhaul, supra,* 452 A.2d at 374).

Although appellant is correct in pointing out that only the mitigation instruction used the word "mistake," we do not believe that, examined as a whole, the instructions misled the jury. The jury had been informed that appellant's view of the circumstances at the time was an integral part of evaluating the reasonableness of appellant's actions. The mitigation instruction stated that an honest but unreasonable belief in the danger or the degree of force necessary would mitigate. See note 8 *supra.* The jury instructions taken as a whole adequately presented the jury with the principle that if appellant had an honest and reasonable, even if mistaken, belief in the need to use deadly force to defend himself, an acquittal, rather than mitigation, was to result.

Appellant's reliance on *Bostick, supra,* 605 A.2d at 918 n. 8, is misplaced. Unlike the general instruction in *Bostick,* this instruction informed the jury of the requisite burden of proof on the government. Furthermore, the phrase "adequate provocation" at issue in *Bostick* is more difficult for a jury to understand without additional instruction than is the phrase "circumstances as they

---

**6.** The jury was instructed:

Every person has the right to use a reasonable amount of force in self-defense if, one, he actually believes he is in imminent danger of bodily harm and, two, he has reasonable grounds for that belief. The question is not whether you believe in retrospect that the use of force in self-defense was necessary. The question is whether [appellant] under the circumstances as they appear[ed] to him at the time of the accident, the incident, I should say, actually believed that he was in imminent danger of bodily harm and could reasonably hold that belief.... If you find that the government has failed to prove beyond a reasonable doubt that [appellant] did not act in self-defense, then you must find [appellant] not guilty of first degree murder while armed, of second degree murder while armed and of voluntary manslaughter while armed.

**7.** The instructions stated:

A person may use deadly force in self-defense if that person actually believes at the time of the incident that he himself is in imminent danger of death or serious bodily harm and if his belief is reasonable.... In determining whether [appellant] used excessive force in defending himself, you may consider all of the circumstances under which he acted.... A belief which may be unreasonable to a calm mind may be actually and reasonably entertained in the heat of passion.

**8.** The judge instructed the jury:

Mitigation also exists where a person mistakenly believes that he is acting in self-defense. This may occur when he honestly but unreasonably believes that he is in danger of serious bodily injury or when he honestly but unreasonably believes that the force he uses is necessary to defend himself.

appeared to appellant at the time," on which the false appearances instruction elaborates. Similarly, although a jury may have no reason to interpret "justifiable cause" to include defense of a third party without additional instruction, *Jones, supra,* 555 A.2d at 1028, a jury would naturally interpret reasonableness, in light of "circumstances as they appeared to appellant at the time," to include a mistaken belief in the need for self-defense. Here, as in *Williams, supra,* "it might have been better practice to give the more detailed charge on the point," but we find no reversible error here. 131 U.S.App.D.C. at 157, 403 F.2d at 180. The instructions as given sufficiently presented the applicable law for purposes of this case. *Sloan, supra,* 527 A.2d at 1282 (citing *Carter, supra,* 475 A.2d at 1123).

### B.

Appellant claims that several notes from the jury indicate actual jury confusion on the issue of false appearances, which further warrants reversal on that ground. We might note that at that time, appellant did not renew his request for an instruction directed to false appearances. In any event, we fail to perceive in the course of reinstruction any clear manifestation of jury confusion on the issue or reversible error in the trial court's responses to the several inquiries, particularly in light of appellant's posture with respect thereto. *See Davis v. United States,* 510 A.2d 1051, 1052 (D.C.1986) (per curiam).

One of the first notes from the jury read, "The jury is not able to come to a decision. Would you be able to go over voluntary manslaughter again, stressing the aspect of mitigation?" The court followed appellant's suggestion and repeated the instructions on voluntary manslaughter and mitigation. However, the court inadvertently, and without correction by appellant, did not read the final paragraph of the mitigation instruction which explained "imperfect self-defense." See note 8 *supra.* At appellant's request, the court also told the jury at that time that "self-defense, which is different from mitigation, self-defense is an absolute defense to voluntary manslaughter, just as it is to second degree murder and to first degree murder." A juror then orally asked the trial judge, "There was some mention of, when you were listing on the tape the aspects of mitigation, rage, terror, etc., there was some mention of something about falsely, self-defense falsely, falsely thinking you needed to be acting in self-defense." Out of the jury's hearing the court said that the juror appeared to be referring to the self-defense instruction rather than the mitigation instruction, and appellant agreed. The court then reinstructed the jury on the degree of force allowed in self-defense, including the reminder which the government requested that the jury should keep in mind all of the instructions as a whole.[9]

Thirty-five minutes later the jury sent another note: "While giving instructions yesterday you stated mitigation—falsely acted in self-defense, honestly but unreasonably believes. Today you placed that definition under self-defense. Could you please let the jury know which is correct." In looking for the language to which the jury referred, the judge discovered that it had been left out of the reinstruction on mitigation, and, without objection from appellant, reinstructed the jury on imperfect self-defense.

The next morning the jury sent a note indicating acquittals on first-degree murder,

---

9. The reinstructions were as follows:

The particular statements that I will reread to you that the juror just asked about were given to you in the context of self-defense, not in the context of mitigation. And what I said was in determining whether [appellant] used excessive force in defending himself you may consider all of the circumstances under which he acted.

The claim of self-defense is not necessarily defeated if greater force than would have seemed necessary to a calm mind was used by [appellant] in the heat of passion generated by an assault upon him. A belief which may be unreasonable to a calm mind may be actually and reasonably entertained in the heat of passion.

Now, I remind you again, first of all, that that was only one small part of a much larger instruction about self-defense; secondly, that the self-defense instruction was and is applicable to all of the killing, if you will, offenses, first degree murder, second degree murder and manslaughter; and, third of all, that all of the instructions must be considered as a whole.

second-degree murder, assault on a police officer while armed, and assault with a dangerous weapon and convictions on possession of a firearm during a crime of violence and carrying a pistol without a license, and stating that no unanimous verdict was possible on voluntary manslaughter. The judge informed counsel that a note had been sent indicating a conviction for possession of a firearm during a crime of violence without a predicate crime. As the judge and counsel were discussing the issue, the jury sent another note asking the court to "define what the 'voluntary' means in voluntary manslaughter." The court and both counsel agreed that the jury should be told to ignore the word. The jury was called in and the court took verdicts on each count except possession of a firearm during a crime of violence and voluntary manslaughter. The court asked whether counsel had any requests before reinstruction, to which both responded "no." The court then told the jury to ignore the term "voluntary" and repeated the elements of manslaughter as follows:

> [F]irst that [appellant] inflicted an injury or injuries which caused the death of Mr. McKinney; [s]econd, that at the time [appellant] did so he was armed with a pistol or other firearm; [t]hird, that at the time [appellant] inflicted the injury or injuries he had the specific intent to kill or to seriously injure Mr. McKinney or he acted in conscientious [sic] disregard of an extreme risk of death or serious bodily injury to Mr. McKinney; and, [f]ourth, that [appellant] did not act in self-defense and I told you that in order to find [appellant] guilty of that offense the government must have proven each of those elements beyond a reasonable doubt.

The jury deliberated briefly and returned verdicts of guilty on both of the remaining counts.

From these reinstructions, along with the original instructions, the jury was effectively informed for purposes of this case that if appellant actually and reasonably, although mistakenly, believed that his life was in danger, the verdict must be acquittal, not conviction of manslaughter. In view of all that happened, we conclude that, although it appropriately should have been given, no reversal is mandated here for failure to give the false appearances instruction. Although we can conceive of circumstances in which more detail on the issue of false appearances might be absolutely required in peril of reversal, this is not such a case.

*Affirmed.*