Ivan DRIVER, Appellant,

v.

UNITED STATES, Appellee.

No. 85–723.

District of Columbia Court of Appeals.

Argued Sept. 30, 1986.
Decided Feb. 18, 1987.

William J. Mertens, Washington, D.C., appointed by this court, for appellant.

Saul M. Pilchen, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief for appellee.

Before NEBEKER and NEWMAN, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

■ Appellant was charged by indictment with armed robbery of a senior citizen,[1] D.C.Code §§ 22–2901, –3202, –3901 (1981); forgery, *id.* § 22–3841 (Supp.1986); and uttering, *id.* § 22–3841. A jury found appellant guilty on all counts and he was sentenced to three-to-fifteen years' incarceration for armed robbery, and two-to-ten years' incarceration (each concurrent to the other but consecutive to the armed robbery sentence for forgery and uttering). Appellant now asserts he is not guilty of forgery under the terms of § 22–3841; that there was insufficient evidence to establish his participation in the armed robbery, and that he was improperly sentenced for the forgery conviction. We affirm the convictions but remand for resentencing as to the forgery conviction.

Houston Washington, the complaining witness, testified that on the morning of August 24, 1983, he received a phone call from appellant who offered to drive him to the bank and grocery store that morning. Washington, a seventy year-old man, had known appellant for a couple of years, and appellant had taken him on many errands in the past. Approximately a half hour after the phone call, appellant arrived at Washington's house and took him to the bank.

Washington had to visit the bank to cash several checks for his aunt. When he entered appellant's automobile, Washington had his aunt's checks and other items in a small shaving kit which he carried in his lap. Washington did not tell appellant why he was going to the bank. He did not open

---

1. The indictment reads, in relevant part:
   FIRST COUNT:
   On or about August 24, 1983, within the District of Columbia, Ivan Driver and a person whose identity is unknown to the Grand Jury, while armed with a dangerous weapon, that is, a pistol, by force and violence, against resistance and by putting in fear, stole and took from the person and from the immediate actual possession of Houston Washington, *a person sixty years of age or older,* property of value belonging to Houston Washington, and Lucille Howard, consisting of money orders, money, medicine, keys and a pouch. (Armed Robbery, *of a Senior Citizen,* violation of 22 D.C.Code, Sections 2901, *3901,* 3202). [Emphasis added.]
   This is the first time an indictment including this enhancement provision of § 22–3901 has been before the court. That code provision reads, in its entirety:
   Chapter 39. Crimes Committed Against Senior Citizen Victims.
   § 22–3901. Enhanced penalty.
   (a) Any person who commits any offense listed in subsection (b) of this section against an individual who is 60 years of age or older, at the time of the offense, may be punished by a fine of up to 1½ times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1½ times the maximum term of imprisonment otherwise authorized for the offense, or both.
   (b) The provisions of subsection (a) of this section shall apply to the following offenses: Robbery, attempted robbery, theft, attempted theft, extortion, fraud in the 1st degree, and fraud in the 2nd degree.
   (c) It is an affirmative defense that the accused knew or reasonably believed that the victim was not 60 years of age or older at the time of the offense. (Dec. 1, 1982, D.C.Law 4–164, § 201, 29 DCR 3976.)
   Including enhancement provisions in an indictment such as this adds to the government's burden of proof by introducing a separate element to the offense that must be proved. It should be noted here that the trial court chose not to sentence appellant under this scheme. We do not decide today whether § 22–3901 *requires* this element to be included in the indictment when the victim is 60 years of age or older at the time of the offense. It is clear, however, that on the face of the statute, it is within the discretion of the trial court to apply or ignore the enhancement provision when sentencing, despite the fact that the additional burden had been met by the government here.

the shaving kit while in appellant's car. Washington entered the bank alone and obtained three blank money orders for his aunt. He recalled that one money order was for $300, and another was for $200; he could not remember the denomination of the third. He took these blank money orders, some of his aunt's cash, and some cash that he withdrew from his own account and placed them inside the shaving kit. He then reentered appellant's car.

Appellant then asked for, and received, thirty dollars from Washington, saying that he needed the money to pay back a loan to a friend. Appellant then told Washington that he had to visit the friend prior to taking him to the grocery store, and drove to, and entered, an apartment building on Virginia Avenue where he remained for fifteen or twenty minutes. During that time, Washington remained alone in the car with the pouch on his lap. Appellant then returned to the car and got behind the wheel. Before he started the car, however, a gunman ran out of the apartment building which appellant had just left, and approached the driver's side of the car. Without saying a word, the gunman "poked" appellant with his gun, reached across the front seat of the automobile, and took Washington's shaving kit. The gunman took nothing from appellant, did not search further in the vehicle for valuables, and immediately ran back into the apartment building.

Appellant told Washington that he did not know the thief. Washington did not recognize him either. Nevertheless, appellant ran into the apartment building in pursuit of the gunman, and emerged alone about fifteen minutes later. Before he returned, however, an unknown man approached Washington and returned the shaving kit, saying that it was found on the ground. The money orders and cash had been removed.

Appellant did not mention anything further about the armed robbery, and did not call the police. Instead, appellant drove Washington to the grocery store, and although usually appellant would wait for Washington to complete his shopping and

then take him home, on this occasion he waited only five minutes and then drove off alone. Washington took the bus home.

When he arrived home in the early afternoon, Washington called the bank and spoke with Mona Tolle, the manager. He told her about the robbery, and she called the police, who later interviewed Washington.

Mona Tolle, the bank manager, testified that Washington, whom she had known for over fifteen years, purchased three money orders on August 24, 1983. The value of the money orders was $300, $225, and $115, respectively. When he called her that afternoon to report that they had been stolen, she called a "hot line" to report the numbers of the stolen instruments. As Tolle was phoning in these numbers, Diane Peay, a teller who was standing about five feet from Tolle, came over and reported that a man was at her window trying to cash one of the stolen money orders. The person trying to cash the money order was identified as appellant.

Diane Peay, the teller, testified that she had worked at the bank for several years, and knew both Washington and appellant. On the afternoon of August 24, 1983, appellant came to her window, presented a blank money order, and asked her to cash it. Peay asked appellant for some identification, and he gave her his driver's license. She then asked him to fill out the money order with his name and address, and she watched him do this. It was during this time that Peay overheard Tolle reporting over the phone the numbers of the stolen money orders. Apparently in response to her queries, appellant told her that he had purchased the money order from the bank. Despite this explanation, she took the money order that appellant had just signed, and his driver's license, and showed them to Tolle.

Tolle took the stolen money order from Peay, and asked appellant how he had obtained it. Appellant then informed her that he had found the money order in a hallway. Apparently after learning that Tolle knew the instrument was stolen, appellant told her that he was at the bank at Wash-

ington's behest, and that he was going to take the cash to Washington. However, when Tolle called Washington and explained the matter to him, Tolle recalled that Washington was confused. Appellant then spoke briefly on the phone to Washington, in a conversation that Tolle did not hear, and afterwards told Tolle that Washington wanted him to return the money order. Tolle did not believe appellant's representations and called the police. When the police arrived at the bank, she gave them the money order that appellant had tried to cash and directed them to Washington's house.

Detective John Flatley, assigned to the robbery branch of the Metropolitan Police, interviewed Washington on the day of the robbery and visited the Virginia Avenue crime scene with him. He also spoke with Tolle and Peay. Following his investigation, he arrested appellant on August 31, 1983, and took handwriting samples from him.

I.  The Sentence

■ Appellant received concurrent sentences of two-to-ten years' imprisonment for the forgery and uttering convictions. He contends that under the sentencing scheme established by D.C.Code § 22–3842, these sentences are illegal. We agree. Because the written instrument involved was of a value of more than $250 but less than $10,000, the concurrent sentences under D.C.Code § 22–3842(a) were improper and he must be resentenced in accordance with § 22–3842(b).[2]

■ Appellant goes on to contend that, when his case is remanded for resentencing, the trial judge may only sentence him under § 22–3842(c), which provides for a penalty of not more than $2,500 and/or three years' incarceration. He urges this position by claiming, for the first time, that his indictment did not adequately allege that the instrument he forged and uttered

carried a value of $250 or more. This appeal presents appellant's first challenge to the sufficiency of the indictment. When an indictment is attacked for the first time on appeal, it will be " 'liberally construed in favor of validity[.]' " *United States v. Bradford,* 482 A.2d 430, 433 (D.C.1984) (quoting *United States v. Pheaster,* 544 F.2d 353, 361 (9th Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977)).

We have consistently held that:

Unless an indictment is "so deficient as to be totally lacking in the statement of an offense," an appellant's failure to object to it prior to trial will constitute a waiver of his right to that objection on appeal. If, however, the indictment does state the elements of the offense—as does the one here—and merely lacks particularity, an appellant may assert this lack of particularity on appeal if he made an objection at trial.

*Williams v. United States,* 404 A.2d 189, 192 (D.C.1979) (citations omitted).

Appellant did not move to dismiss this indictment before trial. Similarly, he did not raise an objection at trial.

Nonetheless, in this case, it is correct that appellant's indictment does not say in so many words that the value of the money order he forged and uttered was of a value of $250 or more. However, the indictment's forgery count contains a photocopy of the actual money order at issue in the case, and the uttering count makes reference to the copy and incorporates it "by reference." The photocopy, which clearly reveals that the value of the money order is $300, was sufficient in the context of this case to provide the necessary allegation of value.

II.  Forgery Under Section 22–3841

■ Appellant contends also that the recently enacted forgery statute, D.C.Code § 22–3841, marks a return to common law

---

**2.** Under the predecessor statute, D.C.Code § 22–1401, appellant's sentence would have been wholly appropriate. The new statute, however, establishes a sentencing hierarchy providing different penalties based upon the types of writings

forged or uttered, or the facial value of those writings. *See Extension of Comments on Bill No. 4–133: The District of Columbia Theft and White Collar Crimes Act of 1982,* at 66. (D.C. July 20, 1982).

elements [3] of forgery. We disagree. The legislative history of § 22–3841 demonstrates no intention to reanimate the common law offense of forgery in the District of Columbia.[4] *See Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc) (reference to legislative history helpful in continuing statutory language).

█ The "overall purpose" of redrafting the theft and fraud-related statutes in the District of Columbia was "to revise and modernize the District of Columbia criminal laws relating to [*inter alia*] forgery[.]" Clarke, *Report of the Committee on the Judiciary on Bill No. 4–133, the District of Columbia Theft and White Collar Crimes Act of 1982* at 1 (D.C. June 1, 1982) (hereinafter "Report"). The recodification was intended:

(1) to consolidate and clarify the law; (2) to promote more effective law enforcement by removing anachronisms and unnecessary technical statutory and common law distinctions which have hampered law enforcement; (3) to modernize the law so that it adequately addresses new public safety concerns and needs; and (4) to identify and proscribe harmful activity which is not currently prohibited by the District's criminal law.

*Id.* These intentions do not manifest a desire by the Council to narrow the types of conduct punishable as forgery.[5] The Report indicates the legislature's intention to "clarif[y] the offense of forgery" rather than to mark a new departure from existing law. *Id.* at 2.

This Report, and the Extension of Comments filed by David A. Clarke, establish that the broad scope of old § 22–1401, including those consistent common law trends expressed by this court in *Martin v. United States,* 435 A.2d 395 (D.C.1981) and other cases, was intended to be incorporated in § 22–3841.

This court ruled in *Martin, supra,* that "[f]orgery is a statutory and not a common law crime in the District of Columbia." 435 A.2d at 397. Section 22–1401 had long been construed as "a statute of almost limitless scope [,]" which had been "broadly interpreted." *United States v. Briggs,* 54 F.Supp. 731, 732 (D.D.C.1944). In contrast to the common law offense, § 22–1401 encompassed writings that were "genuine," but nevertheless completed without authorization and with the intent to defraud.[6]

In *Martin,* we specifically rejected a claim that the insertion of true names on a

---

**3.** The common law offense required a finding that the writing in question was not "genuine." This term of art encompassed a forged or "falsely made" writing, which purported to be something that it was not, rather than a false statement (or misrepresentation of authority) entered on an otherwise legitimate document. *See, e.g., Marteney v. United States,* 216 F.2d 760, 763 (10th Cir.1954) (forgery is "a spurious or fictitious making as distinguished from a false or fraudulent statement. The words relate to genuineness of execution and not falsity of content") (citing cases relying on common law definition of offense).

**4.** Section 22–3841 was reported to the City Council as part of D.C.Bill No. 4–133, the "District of Columbia Theft and White Collar Crimes Act of 1982."

**5.** During oral argument, the court raised the question, *sua sponte,* of whether the forgery statute in question here contained the single offense of forgery or the dual offenses of forgery and uttering. Appellee urges, and we agree, that in determining whether the indictment was multiplicitous, "the decisive consideration is the intent of the legislature." *Dunham*

*v. District of Columbia,* 442 A.2d 121, 125 (D.C. 1982). Appellant does not suggest how the clear expressions of legislative intent quoted above can be reconciled with a restrictive reading of the statute as creating one offense. The current statute provides that "forgery" may actually be committed by forging *or uttering* a written instrument. We are confident that the intent of the drafters was that each separate commission of forgery or uttering constitutes a separate offense.

**6.** *Compare, e.g., Yeager v. United States,* 59 U.S. App.D.C. 11, 12, 32 F.2d 402, 403 (1929) (§ 22–1401 covers agent who endorsed checks with true name and converted them to his own use instead of depositing them in company's bank as instructed), with *Gilbert v. United States,* 370 U.S. 650, 655, 657–59, 82 S.Ct. 1399, 1402, 1403–04, 8 L.Ed.2d 750 (1962) (federal forgery statute, 18 U.S.C. § 495, which court held adopted common law definition of forgery, did not cover agent's true name endorsements on otherwise legitimate government checks, even when intent to defraud shown).

blank money order did not render the instrument "falsely made or altered." 435 A.2d at 398. The court stated:

> It is the unauthorized *completion* of the stolen money orders which renders the instruments "falsely made or altered." Absent the true owner's authority to complete the blank money orders, the insertion by another of any information onto those orders is a false making or alteration of the documents in violation of the statute.

*Id.* (emphasis in original) (citing *Lieberman v. United States*, 102 U.S.App.D.C. 310, 253 F.2d 46 (1958), and *Yeager v. United States*, 59 U.S.App.D.C. 11, 12, 32 F.2d 402, 403 (1929)).

■ Here, appellant Driver completed money orders not purchased by him or endorsed to him, and presented them for payment. That he did not complete them prior to entering the bank, but rather did so at the teller's window upon her instruction, is irrelevant. He did complete them knowing they were not lawfully his, and intending to do whatever the bank required to render them negotiable. The jury's verdict is consistent with the proof required under the statute, and accordingly, we affirm the forgery and uttering convictions.

### III. Armed Robbery

■ Appellant challenges his conviction for armed robbery, asserting that a reasonable jury could not have found beyond a reasonable doubt that he aided and abetted the actual gunman who stole Washington's money orders and cash. We disagree.

The government's theory at trial was that appellant "set up" Washington to be robbed by entering the Virginia Avenue building and tipping off the gunman that the elderly man probably had valuables or money in his shaving kit, and then sharing in the proceeds immediately after the robbery. The "oft-recited elements of aiding and abetting are: (1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge." *West v. United States*, 499 A.2d 860, 865 (D.C. 1985) (citations omitted). The evidence in

the instant case was enough to show that appellant "designedly encouraged" the armed robbery. *Creek v. United States*, 324 A.2d 688, 689 (D.C.1974) (quoting *Bailey v. United States*, 135 U.S.App.D.C. 95, 98–99, 416 F.2d 1110, 1113–14 (1969)).

The standard of review for legal sufficiency of the evidence is well-settled. We need only to determine whether the evidence adduced at trial was sufficient to permit reasonable jurors to find guilt beyond a reasonable doubt. *Dyson v. United States*, 450 A.2d 432, 436 (D.C.1982). The evidence must be viewed in the light most favorable to the government, giving it the benefit of all reasonable inferences and making allowances for the factfinder's right to determine the credibility of witnesses. *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984); *Smith v. United States*, 343 A.2d 40, 42 (D.C.1975). It is not necessary for the government's evidence to compel a finding of guilt beyond a reasonable doubt, nor must the government negate every possible inference of innocence. *Dyson, supra,* 450 A.2d at 436. In applying these standards, we need not make any distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C.1978).

The evidence established, *inter alia*, that appellant drove Washington to a building on Virginia Avenue, ostensibly to repay a loan to someone known to him only as "J.R." He was in the building alone for approximately fifteen or twenty minutes, even though no one answered the doorbell at his acquaintance's apartment. Appellant then left the apartment building and returned to his car, but did not immediately drive away. At this time, a gunman came out of the same building appellant had just left, approached the car, and without saying a word reached directly across appellant in an apparently uncomfortable posture and snatched the shaving kit from the complainant's lap. Without taking anything else or even searching cursorily for other objects of value, the robber fled back into the building from which appellant had so recently exited.

In sum, the sequence of events surrounding the robbery, appellant's uncharacteristic conduct on the day of the robbery, his possession of the stolen money orders, and the logical chain of inferences drawn therefrom, provided the jury with ample evidence from which to find beyond a reasonable doubt that he planned with another to rob Washington, and profited from the robbery. *Cf. United States v. Wolford,* 144 U.S.App.D.C. 1, 9, 444 F.2d 876, 884 (1971) (noting "carefully planned and prearranged" nature of robbery), *compare Bailey v. United States, supra,* 135 U.S.App. D.C. at 99–100 n. 34, 416 F.2d at 1114–15 n. 34 (reversing alleged accomplice's conviction, noting that evidence of cooperation, joint planning, or sharing of proceeds absent). His conviction for armed robbery, therefore, is affirmed; remanded for resentencing as to the forgery conviction.

*So ordered.*

