**David BELTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Gary T. GORDON, Appellant,**

v.

**UNITED STATES, Appellee.**

**James COWAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 88–446, 88–573 and 88–773.**

District of Columbia Court of Appeals.

Argued Nov. 29, 1989.
Reargued Feb. 14, 1990.
Decided Sept. 6, 1990.
Rehearing Denied Oct. 25, 1990.

Stephen O. Russell, Washington, D.C., for appellant Belton.

Lillian Alvarez McEwen, Washington, D.C., for appellant Gordon.

Richard S. Greenlee, Public Defender Service, with whom James Klein and Henderson Hill, Public Defender Service, Washington, D.C., were on the brief, for appellant Cowan.

Per A. Ramfjord, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, Washington, D.C., and Charles W. Cobb, Asst. U.S. Attys., Boston, Mass., were on the brief, for appellee.

Before FERREN, TERRY * and SCHWELB, Associate Judges.

* Senior Judge Pryor was a member of the divi- sion that heard this case on November 29, 1989.

FERREN, Associate Judge:

Although appellants raise a variety of issues on appeal, not all of which are applicable to each of them, the principal question we must answer is whether appellant Cowan's sentencing hearing was unfair because the trial judge had engaged in *ex parte* communication that, Cowan contends, violated Canons 3(A)(4) and 3(C)(1) of the ABA Code of Judicial Conduct. We deal with that issue in Part III, resolving the other issues summarily in Part II.

A jury convicted appellants and two co-defendants of conspiracy to possess and distribute cocaine, D.C.Code §§ 33–541(a)(1), –549 (1988), assault with a dangerous weapon, *id.* § 22–502 (1989), and attempted distribution of cocaine, *id.* §§ 33–541(a)(1), –549. Appellant Cowan was convicted of carrying a pistol without a license, *id.* § 22–3204 (1989).[1] For the conspiracy convictions, appellants were sentenced to prison terms of twenty months to five years; in addition, appellant Belton was fined $10,000. For attempted distribution, each appellant was sentenced to imprisonment for a period of twenty months to five years; in addition, appellant Belton was fined $10,000. For assault with a dangerous weapon, Cowan and Belton were each sentenced to prison for a period of forty months to ten years, and appellant Gordon was sentenced to a term of thirty months to ten years.[2] Cowan also was sentenced to one year of incarceration for carrying a pistol without a license.

On appeal, Belton contends that the evidence was insufficient for conviction of each of the three offenses and that the trial court erred in denying his severance motion. Gordon's only contention on appeal is the trial court's alleged error in denying his severance motion. Cowan argues that the evidence was insufficient to convict him of attempted distribution of cocaine and that the trial court engaged in improper *ex parte* communication which denied him a fair sentencing hearing. Finally, this court *sua sponte* has considered the propriety of the prison sentences of twenty months to five years imposed for attempted distribution of a controlled substance pursuant to an indictment that cited D.C.Code § 33–541(a) (concerning manufacture, distribution, or possession of controlled substances) and *id.* § 33–103 (1988) (concerning definition of adulterated articles) but not *id.* § 33–549 (concerning attempt and conspiracy to manufacture, distribute, or possess controlled substances). We affirm all convictions, except to remand for resentencing Cowan by a different judge because of an appearance of impropriety attributable to the trial judge's unexplained reference at the original sentencing hearing to an *ex parte* contact with persons highly critical of Cowan.

### I.

According to the government's evidence, appellants were part of a conspiracy to distribute "crack" cocaine in the Paradise and Mayfair Manor apartment complexes of northeast Washington, D.C. All three appellants sold cocaine and recruited runners to make additional sales. Belton and Cowan also acted as "enforcers," protecting the conspirators against embezzlement by the runners and robbery by outsiders. At times, Gordon cooked cocaine and assisted in money handling.

Samuel Giles, a co-conspirator who pleaded guilty to two counts of second-degree murder, testified on behalf of the govern-

He later recused himself and was replaced by Associate Judge TERRY for reargument on February 14, 1990.

1. Appellants were acquitted of first-degree (felony) murder while armed, D.C.Code §§ 22–2401, –3202 (1989), of first-degree (premeditated) murder while armed, *id.*, and of second-degree murder while armed, D.C.Code §§ 22–2403, –3202 (1989), of Kevin Dozier on November 3, 1986. Appellant Gordon subsequently pled guilty to an additional charge of attempted dis-

tribution of a controlled substance, *id.* §§ 33–541(a)(1), –549, pursuant to a plea agreement under which as yet untried offenses were dismissed.

2. The court ordered all of Belton's and Cowan's sentences to run consecutively. The court ordered Gordon's sentences for conspiracy and attempted distribution to run concurrently with each other but consecutively to the sentence for assault with a dangerous weapon.

ment about the events of November 3, 1986, the day on which many of the events described in the indictment allegedly took place. According to Giles, he and Cowan, both "enforcers," went to a "base house" of the conspiracy looking for Leroy Hines. Apparently Hines owed money to the leader of the conspiracy, Tony Adams (also known as Kenilworth Fats), and Adams had told Cowan and Giles to "see if [Hines] had that money." Cowan and Giles found Hines, hit him repeatedly, and "dragged him over to [Adams]." Adams told Cowan to kill Hines, but Giles intervened and, instead, Cowan and Giles "just whipped his tail." Both Cowan and Giles were carrying guns. One witness testified that Cowan and Giles "pistol whipped" Hines.

After beating Hines, both Cowan and Giles walked first to Adams and then to a lamppost, where they were met by Belton and James Madison. Giles testified that

> [Madison] said that somebody was getting ready to come and buy some coke from [Adams].... About that time a man walked up to [Adams]. When he walked up to [Adams,] [Belton] like stood in front of like catty-corner, you know, when I looked over, looked at [Adams], the dude was up to him. Then that's when [another man] was coming around the back.... [T]hat's when I heard the gunshot. [Adams] fell down on the ground and started hollering. [Cowan] started running.... I started running. We started firing at the dude.

Cowan and Giles chased the man—Kevin Dozier—who had been standing with Adams; they each fired three shots at him. Dozier entered an apartment building. When Giles and Cowan reached the building, Cowan told Giles he saw Dozier in the building "l[ ]ying on the ground."

After the chase, Giles "went running down to see what was the matter with [Adams]." Adams was standing up and brushing himself off. The zip-lock bag of cocaine which Adams had been carrying was on the ground near him. According to Giles, Adams "must have had [the bag] open[,] [b]ecause when he fell the [co]caine

like came out of it. It was in little bags. * * * [I]t was a whole lot of [co]caine...."

## II.

We may readily dispose of all the issues except for the alleged unfairness of Cowan's sentencing hearing.

## A.

▮ The evidence was sufficient to convict Belton of conspiracy, attempted distribution of cocaine and assault with a dangerous weapon, and to convict Cowan of attempted distribution. The government's evidence showed that two or more persons, including Belton, formed an agreement to possess and distribute cocaine; that Belton knowingly and voluntarily participated in that conspiracy; and that at least one overt act was committed in furtherance of the common scheme. *See United States v. Osgood,* 794 F.2d 1087, 1094 (5th Cir.), *cert denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986); *United States v. Treadwell,* 245 U.S.App.D.C. 257, 263, 760 F.2d 327, 333 (1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Moreover, under *Pinkerton v. United States,* 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), a party to a conspiracy may be held responsible for substantive offenses committed by a co-conspirator in furtherance of the conspiracy. *See also United States v. Tarantino,* 269 U.S.App.D.C. 398, 412, 846 F.2d 1384, 1398 (where appellant's co-conspirators, but not appellant, "laundered" cocaine profits, laundering acts were also attributable to appellant), *cert. denied,* 488 U.S. 840, 867, 109 S.Ct. 108 & 174, 102 L.Ed.2d 83, 143 (1988); *United States v. Lemire,* 232 U.S.App.D.C. 100, 125, 720 F.2d 1327, 1352 (1983) (upholding conspirator's conviction on substantive offenses based on foreseeable acts of co-conspirators perpetrated in furtherance of conspiracy), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Thus, Belton was properly convicted for assault with a dangerous weapon based on the pistol-whipping of Leroy Hines by co-conspirators Cowan and Giles. Similarly, Belton and Cowan were lawfully

convicted for co-conspirator Adams' attempted distribution of cocaine.[3]

## B.

██ Nor did the trial court err in denying Belton's and Gordon's motions for severance. Contrary to each appellant's contention, in neither case was the evidence against the appellant insignificant when compared with the evidence against the co-defendants. *See Christian v. United States,* 394 A.2d 1, 21 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Nor, in Belton's case, was his defense irreconcilable with the defenses of his co-defendants. *See id.; (Kirk D.) Williams v. United States,* 382 A.2d 1, 8 (D.C.1978).

## C.

██ Belton, Gordon, and Cowan were sentenced to prison for twenty months to five years for attempted distribution of a controlled substance (cocaine), D.C.Code §§ 33–541(a)(1), –549. In response to this court's *sua sponte* inquiry, they argue these sentences cannot stand because the fifth count of the indictment cited D.C.Code § 33–103 instead of § 33–549 for the "attempt" portion of the offense. The argument for invalidation is premised on an assumption that § 33–103 [4] was a mistyped reference to D.C.Code § 22–103 (1989), the general criminal attempt provision permitting maximum imprisonment of one year, and that the grand jury accordingly intended to charge the attempt offense under § 22–103 instead of under § 33–549, a more specific attempt (and conspiracy) provision permitting the longer prison sentences imposed in this case.

██ In light of the fact that § 33–103 is an obviously incorrect citation, appellant could have had no sound reason for relying on it.[5] But, in any event, the facts stated in the fifth count, coupled with the reference to D.C.Code § 33–541(a)(1) (unlawful possession or distribution of controlled substance), gave appellants clear notice of a charge of attempted distribution of a controlled substance, which under the District of Columbia Code, as under the federal statute, "is punishable to the same degree as the offense which was the object of the conspiracy." *United States v. Kennington,* 650 F.2d 544, 546 (5th Cir.1981) (per curiam); *see* D.C.Code § 33–549; *see also* Super.Ct.Crim.R. 7(c) (indictment shall state for each count official or customary citation; and any error in citation shall not be ground for dismissal if it "did not mislead the defendant to his [or her] prejudice").

We would so rule even if appellants had raised the issue at trial. But here, no one questioned the citation to § 33–103 until this court did so *sua sponte.* Accordingly, in concluding that appellant received clear notice of the attempted distribution charge, we are convinced without doubt that the indictment is not " 'so deficient as to be totally lacking in the statement of an offense,' " *Driver v. United States,* 521 A.2d 254, 257 (D.C.1987) (quoting *(Joseph M.) Williams v. United States,* 404 A.2d 189, 192 (D.C.1979)). As a consequence, appellants must be deemed to have waived the miscitation argument on appeal. *Id.*

## III.

### A.

Cowan argues that an *ex parte* conversation between the trial judge and third par-

---

**3.** Because appellants were charged with attempted distribution of a controlled substance, the defense of impossibility was not available to them. *Seeney v. United States,* 563 A.2d 1081, 1083 (D.C.1989) (analyzing legislative history of federal analogue of D.C.Code § 33–549), *petition for cert. filed,* No. 90–5024 (1990).

**4.** D.C.Code § 33–103 defines an "adulterated article," the sale, exchange, or delivery of which is proscribed by D.C.Code § 33–101 (1988).

**5.** If any appellant had thought that § 22–103 might be involved or had had any other doubt about the charge and related punishment, he could have filed a motion for a bill of particulars, as Cowan did with respect to the first count of the indictment. *See (Joseph M.) Williams v. United States,* 404 A.2d 189, 193 (D.C.1979) (citing *Hsu v. United States,* 392 A.2d 972, 977 (D.C.1978)).

ties undermined the fairness of his sentencing hearing. At that hearing, Judge Walton asked Cowan if he had anything he wished to say. Cowan concluded his response with the following comments:

> I just feel that there is a whole lot of times I look in your face, I look at you and I say to myself, this man don't know me from no where. This guy don't know me from no where. He feels this way and that way. I don't know why, man. But I feel you all should take an inventory of yourself before you all look at somebody else and say you are this way, or you are that way. So that is all I got to say.

Judge Walton replied:

> All I need to do is look at your record and see your history in the juvenile system where you were convicted of felony murder. I mean, that says something about a person. And all you need to do is go out to Mayfair Manor Friday night. I was talking to some women who live out in Mayfair Manor and they know [James Cowan].[6] And they said that [James Cowan] was making their li[ves] miserable. . . .

Cowan and the court then engaged in the following dialogue:

> THE DEFENDANT: They say they knew me?
>
> THE COURT: Yes, they have heard of you.
>
> THE DEFENDANT: They know me personally?
>
> THE COURT: And you go out to Mayfair Manor, or Paradise and talk to people out there, you know, they say that because of you and your running partners who were out there selling drugs, that you were making life miserable for them and it probably doesn't mean anything to you. I am sure it doesn't, Mr. Cowan.

The judge continued, stating on several occasions that he had an obligation to take Cowan off the street for at least a period of time and to let people in the community know that the law cares about and protects them. The judge then sentenced Cowan to the maximum sentence on each of the crimes for which he had been convicted. Moreover, Judge Walton imposed the sentences consecutively, resulting in a cumulative sentence of from six years and eight years to twenty years on the felony charges, plus one year for carrying a pistol without a license.

At the sentencing hearing on May 24, 1988, Judge Walton did not disclose the circumstances surrounding his conversation with residents from Mayfair Manor. Cowan, moreover, failed to object at that time. After he had been incarcerated, however, Cowan wrote a letter to the judge which the judge received on August 18, 1988. In the letter, Cowan requested that Judge Walton recuse himself from Cowan's upcoming trial on related, previously severed charges. In his written order denying Cowan's pro se motion for recusal, Judge Walton offered the following explanation:

> This judge did attend an affair in which several residents who live in the Mayfair Manor apartment complex were present. While in my presence, they started to discuss the problems they were experiencing due to drug trafficking in their area. As soon as they mentioned defendant Cowan's name and the names of his co-defendants, I immediately told them I could not discuss or be a part of a conversation concerning the case because it was still pending before me. There were no further discussions about the drug trafficking problem thereafter. Moreover, I subsequently declined a speaking invitation at the apartment complex because of my involvement in defendant's case.
>
> The brief remarks made in my presence about the defendant in no way influenced the sentence the court imposed. Furthermore, the court is confident that the defendant was afforded a fair trial, having received numerous favorable ruling[s] from the court, and will also re-

---

**6.** Judge Walton initially, and incorrectly, referred to Cowan as Sammy Giles, the government's key witness. The judge, however, corrected himself, making clear that he knew he was speaking to James Cowan.

ceive a fair trial from this court in the impending trial.

### B.

 Although Cowan did not ask Judge Walton to recuse himself at the sentencing hearing because of the *ex parte* conversation with Mayfair Manor residents, we do not believe this affects our standard of review under the circumstances of this case. First, it would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place.[7] Second, a judge should know the ethical restraints on the judicial office; a defendant should not be penalized on appellate review for failure to point out to a judge the ethical rules which the judge should know without coaching. As we noted in a somewhat different context in *Scott v. United States*, 559 A.2d 745, 755–56 (D.C.1989) (en banc), relying on *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988):

> The *Liljeberg* special harmless error test makes clear ... that it hardly would be appropriate to place on a criminal defendant the burden to attack a judge's integrity. Rather, the duty to ensure judicial conduct in accordance with the Canons resides, at least in part, with this court. [Footnote omitted.]

*Scott* did not address the issue of failure to object to judicial impropriety because the impropriety was disclosed for the first time after trial. The quoted language, however, is as relevant in the present context as it was in the harmless error analysis in *Scott.* Less than two months earlier, in *Turman v. United States*, 555 A.2d 1037 (D.C.1989) (per curiam), we reversed a conviction because of the trial judge's appearance of partiality at trial, even though the defendant had not objected at the time. The fact that this failure to object was not addressed in our opinion is an indication that neither the government nor this court perceived that the defense had the principal burden of identifying and expressing the ethical concern at trial.

In any event, Cowan did call his concern about the *ex parte* communication to the judge's attention less than three months after the sentencing, with a view to the judge's recusal from Cowan's upcoming trial on the severed charges. We believe that Judge Walton, having been made aware of the ethical concern, should have treated Cowan's letter as a timely motion for reconsideration in the present case as well. *See Pettaway v. United States*, 390 A.2d 981, 984 (D.C.1978) (duty to be indulgent of pro se pleadings); Super.Ct.Crim.R. 35 (motion to reduce sentence or to correct sentence imposed in illegal manner may be made not later than 120 days after sentence is imposed). We therefore see no reason to conclude that Cowan has waived or compromised his objection; he is entitled to the standard of review available to any

---

7. Despite our dissenting colleague's apparent view that all criminal defendants at sentencing ought to view all trial judges as impartial, defendants are not always likely to be so confident, especially if a defendant hears the kind of remark about an *ex parte* contact made by the trial judge here. We can understand why a defendant and counsel, confronted *without explanation* by a comment about an *ex parte* contact highly critical of the defendant, would be skeptical about the judge's reaction in the event defense counsel questioned the judge's ethics just before sentence was pronounced. If, as our colleague says, "[w]e can surely expect all competent lawyers ... to know that judges are not supposed to have *ex parte* discussions with third parties about a pending case," *post* at 1217, then even more certainly we can expect the judge to know this as well. To put the ultimate failure to identify the ethical issue on defendant and counsel, rather than on the judge, at a sentencing hearing, with the consequence of diluted appellate review, would be unfair under the circumstances. Moreover, our dissenting colleague's concern that we are giving defendants "a ground for reversal in [their] hip pocket[s]," *post* at 1216 n. 3, is overstated. Whether an appearance of impropriety is a ground for reversal is determined by applying the *Liljeberg* special harmless error test. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988); see also *infra* Part III.D. Under this test, reversal is appropriate only in cases where a contrary result would produce an injustice and/or undermine the public's confidence in the judicial process.

criminal defendant who has made a timely request for relief.

## C.

■ We turn to the question whether Judge Walton's conduct violated Canons 3(A)(4) or 3(C)(1) of the ABA Code of Judicial Conduct.[8] Canon 3(A)(4) provides in relevant part:

A judge should accord to every person who is legally interested in a proceeding, or his [or her] lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

Canon 3(C)(1) provides where relevant:

A judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned....

This court has addressed the reach of these Canons several times, most recently in *Scott* (reversible error, based on appearance of partiality, where judge, who was negotiating for future employment with Department of Justice's Executive Office for United States Attorneys, presided at trial prosecuted by Department of Justice through United States Attorney's office). *See also Turman* (judge created appearance of partiality, requiring reversal, where he announced to parties that he had good impression of credibility of police officer witness, based on witness's past appearances before him, and then assessed witness's credibility without assuring parties that previous impressions would play no role in pending case); *Sloan v. United States*, 527 A.2d 1277 (D.C.1987) (per curiam) (no violation of Canon 3(A)(4) or appearance of impropriety where judge, at sentencing, announced he had learned after trial that jury had misunderstood instruction on charge of which it had acquitted, that judge would revise instruction in the future, and that judge would not consider that information in sentencing decision).

In *Scott*, we were guided by the recent Supreme Court decision in *Liljeberg* interpreting 28 U.S.C. § 455(a) (1988), a federal statute "substantially similar" to Canon 3(C)(1). *Scott*, 559 A.2d at 749 n. 8. In our analysis here, therefore, we shall rely primarily on *Scott* and *Liljeberg* to determine whether either Canon 3(A)(4) or Canon 3(C)(1) has been violated.

At the sentencing hearing, Judge Walton stated in open court that he had participated in an *ex parte* conversation with residents of the apartment complex where Cowan and his co-defendants had conspired to sell, and had sold, crack cocaine. At that time the judge offered no assurance that he "would not consider the contact as he made his sentencing deliberations." *Sloan*, 527 A.2d at 1287. Therefore, in considering the record as of the time of the sentencing hearing—which, of course, did not include Judge Walton's subsequent explanation—we cannot be confident that he was aware of his obligation under Canon 3(A)(4) not to consider the *ex parte* conversation in his sentencing deliberations or that he was aware his statement, in any event, might create an appearance of partiality in violation of Canon 3(C)(1).

■ It is true, of course, that a judge may consider a wide range of information in aid of sentencing. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (judge's use of presentence investigation in imposing death sentence did not violate due process); *see also Wasman v. United States*, 468 U.S. 559, 563, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984) (sentencing court or jury must be permitted to consider any and all information that reasonably might bear on proper sentence); *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (before determining sentence, court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information ... or the source from which it may come"). Accordingly, Cowan's character and his relationship with the

---

**8.** The ABA Code of Judicial Conduct governs the conduct of judges in the District of Columbia. *Sloan v. United States*, 527 A.2d 1277, 1287 n. 12 (D.C.1987) (per curiam). The text of Canon 3 is set out in full in an appendix to *Scott*, 559 A.2d at 757–60.

neighborhood were relevant to sentencing. *See Williams*, 337 U.S. at 250 n. 15, 69 S.Ct. at 1084 n. 15, 69 S.Ct. at 1084 n.15 (*probation report properly includes information on appellant's offense, prior record, family history, home and neighborhood, education, religion, interests and activities, health, employment, and resources*). The issue, therefore, is not the subject matter; it is the manner in which Judge Walton obtained the information and the resulting concern about whether he relied on that information—or appeared to rely on it—in violation of Canon 3(A)(4) or Canon 3(C)(1) when Cowan had no opportunity to try to discredit it. Given the judge's *ex parte* contact, Cowan could not effectively challenge the information in the way a defendant can challenge a live witness through cross-examination or even in the way a defendant can question the foundation of a presentence report, *see* Super.Ct.Crim.R. 32(b)(3), or the foundation of a victim impact statement, *see* D.C.Code § 23–103(b) (1989). Thus, the reason for the prohibitions of Canons 3(A)(4) and 3(C)(1) is clear: actual or apparent partiality undermines the "confidence in the judiciary ... essential to the successful functioning of our democratic form of government." *Scott*, 559 A.2d at 748 (internal quotations omitted).

■ Given our conclusion that Cowan did not waive or compromise his right to review of Judge Walton's comments at sentencing by failing to object at that time—and thus given the fact that the responsibility for those remarks lay squarely with the judge—we cannot say that Judge Walton's later reply had any bearing on the Canon 3(C)(1) issue. Any problem of appearances—by definition—must be considered by reference to the way events actually appeared, not to the way a situation might have appeared if the judge had said at that time what he said several months later.

■ In applying Canon 3(C)(1), we are mindful of the Supreme Court's statement in *Liljeberg:* "We must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice." 486 U.S. at 864, 108

S.Ct. at 2204 (internal quotations omitted). Accordingly, we must ask whether Judge Walton's statements at the sentencing hearing could lead "an objective observer," *id.* at 861, 108 S.Ct. at 2202, reasonably to question the judge's impartiality, Canon 3(C)(1), because he appeared to consider an "*ex parte* ... communication[ ] concerning a pending or impending proceeding." Canon 3(A)(4).

Specifically, therefore, we consider a hypothetical objective observer who heard Judge Walton say at the sentencing hearing that he had been "talking to some women who live out in Mayfair Manor," who "know" James Cowan, and who said that James Cowan "was making their li[ves] miserable." The observer would know that Cowan had heard about these women for the first time at the sentencing hearing and had had no opportunity to pursue the accuracy of what the judge had reported. The observer would not have heard anything about whether the judge was or was not going to use that information in his sentencing decision. We have no hesitation in concluding that this objective observer would have reasonably believed Judge Walton considered the *ex parte* communication in Cowan's sentencing and thus that his "impartiality might reasonably be questioned," in violation of Canon 3(C)(1). There was not a hint at the sentencing hearing that Judge Walton considered the communication irrelevant.

■ Our review for actual impropriety in violation of Canon 3(A)(4) differs from a review for apparent impropriety because, in reviewing to determine actualities, we necessarily must include consideration of all the relevant evidence extrinsic to the sentencing hearing. Judge Walton's later written explanation in denying Cowan's motion for recusal, therefore, becomes part of this evaluation.

We have no reason to reject Judge Walton's explanation. Nor has appellant Cowan questioned that explanation. Judge Walton, a judicial officer sworn to uphold the law, has represented that "[t]he brief remarks" by residents of Mayfair Manor "about the defendant in no way influenced

the sentence" he imposed. We are satisfied that the judge did not "consider" the information he had inadvertently received. *See Sloan*, 527 A.2d at 1287; Canon 3(A)(4). We also accept Judge Walton's response that, when others began discussing the drug trafficking problem at Mayfair Manor, he interrupted the discussion, stating he could not be part of it, and that there "were no further discussions about the drug trafficking problem thereafter." We are therefore also persuaded that Judge Walton did not "initiate" the *ex parte* communication. *See* Canon 3(A)(4). In short, we conclude that Judge Walton engaged in an apparent impropriety, *see* Canon 3(C)(1), but that no actual impropriety occurred, *see* Canon 3(A)(4).

### D.

▉ Having found a Canon 3(C)(1) violation, we must apply "the special harmless error test of *Liljeberg*," *Scott*, 559 A.2d at 747, since "a review of the record for actual prejudice under the traditional harmless error standard would be inconsistent with the goal of Canon 3(C)(1) to prevent even the appearance of impropriety." *Id.* at 750. We therefore consider three criteria: "[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864, 108 S.Ct. at 2204; *see Scott*, 559 A.2d at 752–53.

▉ Here, the analysis can be presented summarily because the result is clearly indicated. In the first place, the risk of injustice to the government from granting Cowan relief is virtually nil since only a resentencing, not a retrial, is involved. Risk of injustice to Cowan from an apparent reliance on a damaging *ex parte* communication is far more serious. He heard what he heard. No matter how convincing the trial judge was three months later in articulating why there was no actual impropriety, we are reasonably certain Cowan

will never be as sure as we are that the impression conveyed at sentencing was not prejudicial to him. Second, there is a substantial risk that, unless failure to disclose such *ex parte* communications has consequences, judges may relax their guards against appearances of impropriety; thus, the risk that denial of relief in this case will produce injustice in other cases is not insignificant. Finally, we believe the risk of undermining public confidence in the judicial process would be great if no consequences were to flow from the judicial conduct at issue here. Someone who heard what went on at sentencing and never learned of the aftermath, *i.e.*, the judge's explanation, would assume that the judge went outside the record for information germane to sentencing—information Cowan had no opportunity to dispute.

Accordingly, we remand the case for resentencing Cowan before a different judge.[9] In all other respects all appellants' convictions are affirmed.

*So ordered.*

SCHWELB, Associate Judge (concurring in part and dissenting in part):

I agree with the majority that when Cowan told the judge during the sentencing proceedings that "you don't know me from nowhere," and the judge responded in part that some women at Mayfair Manor had told him that Cowan "was making their lives miserable," an impartial observer would have been obliged to conclude that things were not as they should be. A judge is not supposed to have private discussions with third parties about criminal defendants in cases that are before him, nor may he use the fruits of those discussions to negate the defendant's complaints.

Appearances changed considerably however, after Cowan made an issue of the judge's remark. The judge's explanation of the incident, which my colleagues in the majority quite properly accept, was that as

---

9. Judge Walton has resigned from the bench to take a federal appointment, so resentencing in any event would be before a different judge.

soon as the women mentioned the names of Cowan and of his co-defendants, the judge advised them that it would be improper for him to discuss the matter further because the case was still pending before him. He indicated in his written order that he was not influenced, in sentencing Cowan,[1] by the brief remarks which were made during his visit to Mayfair Manor.[2] My colleagues apparently acknowledge, maj. op at 1211–1213, that if this explanation had been provided contemporaneously with the disclosure of the women's comments, any appearance of impropriety would have been dissipated, and the judgment could properly be affirmed. Since the judge did not provide his explanation until several months after the fact, however, my colleagues say that the appearance of impropriety persisted and that Cowan's sentence must be vacated.

Cowan was represented at sentencing by able counsel from the Public Defender Service. When the judge alluded to the remarks which residents of Mayfair Manor had made about Cowan, his attorney could have brought to the judge's attention the fact that Cowan had no knowledge of these apparently *ex parte* discussions and that the judge's invocation of them was inconsistent with Cowan's rights. Counsel could then have requested any appropriate relief. If this had been done, then the judge could have and presumably would have provided on the spot the explanation of the circumstances which he gave when Cowan raised the issue. The majority evidently agrees that this would have eliminated the need for resentencing.

Under the majority's rather unconventional approach, then, Cowan's attorney did his client a favor by not objecting when he could have done so. If a contemporaneous objection had been made and the judge had responded with a contemporaneous disclosure, my colleagues would evidently deny Cowan any relief. Since no objection was made, however, they vacate the sentence and remand for resentencing by another judge. This is an extraordinary signal to send to the defense bar: if you make a timely objection, you lose; if you sit silently by and thus all but preclude the possibility that the trial judge will provide a timely explanation, you win! Objections are ordinarily required "to permit the trial court to fully rule on the issue and thereby to avoid potential error." *Dixon v. United States*, 565 A.2d 72, 80 (D.C.1989). In this case, however, the majority finds it acceptable to defer any objection, prolong the appearance of impropriety, and then prevail on appeal because of the very mischief which counsel might have ended by objecting contemporaneously.[3]

According to the majority, "it would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias [4] at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place." Maj. op. at 1212. If this statement was intended to mean what it seems to say, then my colleagues think that a defendant is justified in proceeding on the assumption that the trial judge is a judicial tyrant who will respond to a legitimate objection by sub-

1. The judge obviously had the Mayfair Manor conversation in mind when he told Cowan about it, but this does not necessarily mean that he considered it in determining the appropriate sentence.

2. Although the judge was not influenced by these remarks, and even though he acted correctly in terminating the discussion and perhaps gave it no further thought, it would have been prudent to disclose the contact to counsel in advance of the sentencing hearing. *See Sloan v. United States*, 527 A.2d 1277, 1286–88 (D.C.1987) (*per curiam*).

3. The majority's approach creates intractable problems. When an "error" occurs which could

have been corrected or dealt with on the spot, and the defendant's failure to object is countenanced by the appellate court, the consequence is that the defendant has a ground for reversal in his hip pocket. He can use it if he is dissatisfied with the outcome, but forever hold his peace if he is satisfied. I cannot agree that a defendant should have such an option, especially where the problem is an *appearance* of impropriety from which he suffered no actual prejudice.

4. The defense's point could, incidentally, have been made without the use of the inflammatory term "bias." See pages 1215–1216, *supra*.

jecting him (the defendant) to cruel reprisals and prolonged incarceration for exercising his basic rights. I suggest that counsel for Cowan knew, and certainly should have known,[5] that the judge would entertain any motion on its merits [6] rather than violating his oath of office by penalizing Cowan for making a legitimate objection.[7]

In further defense of a doctrine which would reward a defendant's failure to make a timely objection, my colleagues maintain, maj. op. at 1212, that

> a judge should know the ethical restraints on the judicial office; a defendant should not be penalized on appellate review for failure to point out to a judge the ethical rules which the judge should know without coaching.

But surely this proves too much. A judge is also supposed to know, "without coaching," the rules of evidence and procedure and the law of agency, not to mention the doctrine of worthier title, the Rule in *Shelley's Case*, and the intricacies of *renvoi*. Nevertheless, in the absence of plain error

---

5. *See United States v. Felder*, 548 A.2d 57, 69 (D.C.1988):
 > Felder, through [Public Defender Service] counsel, in urging us to use a deferential measure of review referred to Judge Walton as an experienced trial judge. Indeed, Judge Walton's experience in the criminal law is broad, deep, and often insightful. We think the best tribute we can give to Judge Walton, is to hold, as we do, after our *de novo* review of the question, that his ruling was eminently correct.

6. This is not to say that Judge Walton would necessarily have been expected to impose a lenient sentence if the merits, without regard to an objection by counsel, justified severe punishment.

7. According to the majority, Judge Walton's allusion, "without explanation," to his *ex parte* conversation about Cowan with some women at Mayfair Manor provided justification for a defense perception that terrible consequences would ensure if counsel "questioned the judge's ethics just before sentence was pronounced." Maj. op. at 1212 n. 7. I appreciate the fact that Cowan and his counsel must have been astonished by the judge's unusual disclosure, but the *ex parte* contact would not have remained "without explanation" if defense counsel had requested one. There was no need for counsel to say "Judge Walton, you are biased and unethical," or to insult the judge in some comparable way.

---

or manifest injustice, a litigant ordinarily waives a point on appeal if he does not press it in the trial court, even where the evidence or ruling to which he failed to object was prejudicial to him. *See Dixon, supra,* 565 A.2d at 80–81; *D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988). Here, the majority agrees that there was no actual prejudice. The present case might perhaps call for a different result from *Dixon* and *D.D. v. M.T.* if the judge's alleged violation had been of some obscure provision of the Code of Judicial Conduct with which counsel might not have been familiar. We can surely expect all competent lawyers, however, to know that judges are not supposed to have *ex parte* discussions with third parties about a pending case and rely on them in sentencing a defendant. An objection was plainly called for.

My colleagues claim to find support in *Scott v. United States,* 559 A.2d 745 (D.C. 1989) (*en banc*), and in *Turman v. United States,* 555 A.2d 1037 (D.C.1989) (*per cu-*

I cannot agree with my colleagues that either defense counsel or this court may legitimately act on the premise that an objection to the *ex parte* conversation and a request for an explanation of it, if made politely and respectfully, would have created some appreciable possibility of improper retaliation on the part of the judge. Every "exception, your honor" is generated by some kind of ruling or action by the trial judge adverse to counsel's client, and we simply cannot presume that a judge will make a defendant pay if his attorney challenges an error on the part of the judge, even where, as here, the error was an undisclosed *ex parte* contact.

As Judge Newman stated for this court in *Johnson v. United States,* 398 A.2d 354, 365–66 n. 8 (D.C.1979) (quoting with deletions MAGRUDER, *The Trials and Tribulations of an Intermediate Appellate Court,* 44 CORNELL L.Q. 1, 3 (1958)),

> we must always bear in mind that they [trial judges] may be as good lawyers as we are or better. They are under the disadvantage of often having to make rulings off the cuff ... in the press and urgency of a trial.... Hence, we should approach our task of judicial review with a certain genuine humility.

There may be a few "rogue" judges who punish litigants for exercising their rights, but at least in this jurisdiction they would be the rare exception rather than the rule. A legal principle which is based on a contrary assumption is flawed in its logic and unjust in its consequences.

*riam*), for the proposition that no timely objection is required where reversal is sought on the basis of an appearance of impropriety on the part of the trial judge. Neither case supports their thesis. In *Scott,* the defendant could not have filed a timely objection to the proceedings, based on the trial judge's employment negotiations with the Department of Justice, because the judge had not disclosed those negotiations at the time of trial and the defendant was not aware of them. Indeed, the court noted that the defendant *had* filed a timely motion to vacate after the facts came to his attention. 559 A.2d at 755. A contemporaneous objection not having been possible in *Scott,* the court was assuredly not holding that a litigant need not make one even if he or she has the opportunity to do so.[8]

In *Turman,* this court reversed the defendant's conviction as a result of the judge's improper comment that, having presided over prior trials in which the prosecution's chief witness had testified, he knew that this witness was credible. There was not a word in this court's opinion, however, as to whether an objection had been or should have been made in the trial court. Accordingly, *Turman* cannot properly be invoked as authority on the question whether such an objection was necessary. I fear that in purporting to rely on *Turman* my colleagues have failed to heed the Supreme Court's admonition, as cogent today as when it was written almost two-thirds of a century ago, that

> [t]he most that can be said is that the point was in the case if anyone had seen fit to raise it. Questions which merely

lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

*Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925); *see also Thompson v. United States,* 546 A.2d 414, 423 n. 14 (D.C.1988).[9]

My colleagues say that they are "satisfied" that in sentencing Cowan, the judge *did not consider the information he had* inadvertently received at Mayfair Manor. Maj. op. at 1214. They find no actual prejudice to Cowan. I would hold that, where a defendant seeks reversal of his conviction (or as in this case, vacation of his sentence) solely on the basis of an appearance of impropriety or partiality on the part of the trial judge, but fails to make a timely objection in the trial court which, under the circumstances, he or she reasonably could have made, the conviction or sentence will not be set aside unless the misconduct was so serious that reversal would have been warranted even if the judge had provided a contemporaneous explanation. No such showing has been made here. Accordingly, I would affirm the judgment of the trial court, and I therefore respectfully dissent from the vacation of Cowan's sentence. In all other respects, I join the judgment and opinion of the court.[10]

---

**8.** The portion of the *Scott* opinion to the effect that it "hardly would be appropriate to place on a criminal defendant the burden to attack a judge's integrity," 559 A.2d at 755, is cited by my colleagues, maj. op. at 1212, somewhat out of context. It is part of a discussion of the interplay between harmless error and appearance of partiality, and does not deal at all with the question whether a timely objection is necessary. In any event, "[i]t is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply." *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.1959); *see also Armour & Co. v. Wantock,* 323 A.2d 126, 132–33, 65 S.Ct. 165, 168,

89 L.Ed. 118 (1944) (words of opinions are to be read in light of facts under discussion; transposition to other facts is often misleading).

**9.** With due respect to my colleagues, I do not think a principle *becomes established* as a precedent because "neither the government nor this court perceived" something that was neither raised nor decided. *See* maj. op. at 1212.

**10.** Four other points which the majority describes as "clearly indicated," maj. op. at 1215, also merit response.

First, my colleagues say, *id.,* that the risk of injustice to the government is virtually nil, be-

cause only resentencing, not retrial, is involved. I agree that the cost in *Scott*—a new trial—was substantially greater. But aside from time, money, and effort which must be expended if Cowan's sentence is vacated, he will have to be sentenced by a judge who did not preside over the trial, and who will have far less familiarity with him than Judge Walton had. *See* Super.Ct. Crim.R. 25(b); *Gaffney v. United States*, 421 A.2d 924, 930–31 (D.C.1980), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2026, 68 L.Ed.2d 330 (1981). (Ironically, Cowan implied that he wanted to be sentenced by a judge who knew him, and it was his complaint that Judge Walton did not know him that precipitated the problem in this case.) A real benefit—sentencing by the judge who knows the most about the defendant—will thus be sacrificed solely for the sake of appearances.

Second, according to the majority, "Cowan will never be as sure as we are that the impression conveyed at sentencing was not prejudicial to him." Maj. op. at 1215. The propriety of vacating Cowan's sentence is not dependent, however, on my colleagues' speculation as to what he may or may not believe. Rather, it turns on how an "objective, disinterested observer fully informed of the facts" would view the situation. *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985); *accord, Scott, supra*, 559 A.2d at 750.

Third, according to my colleagues, there is a risk that "unless failure to disclose such *ex parte* communications has consequences, judges may relax their guards against appearances of impropriety." Maj. op. at 1215. But the publication of an opinion in which the court holds that the judge violated the Code of Judicial Conduct, albeit inadvertently, surely provides adequate deterrence; I do not see how the vacation of the sentence will contribute any additional inhibition. Moreover, I question whether a deterrence rationale is productively invoked where, as here, there was concededly no intentional wrongdoing by the judge.

Finally, my colleagues apprehend that public confidence in the judicial system will be undermined if we do not vacate Cowan's sentence, because some hypothetical person or persons who may have been present when Cowan was sentenced, and who never learned of the judge's explanation of the Mayfair Manor conversation, might continue to believe that judges sentence people on the basis of *ex parte* information. *Id.* This theory founders on its own logic. If a hypothetical spectator at the trial does not read our opinions, then in most cases he or she will not find out, however we decide the case, that the judgment has been reversed. Accordingly, reversal will not redeem the reputation of the judiciary in that spectator's eyes. If a spectator does follow the case and does read our opinion, then he or she will learn from the opinion of Judge Walton's explanation of the *ex parte* contact and of our resolution of the problem, and that should restore his or her respect for the judicial system whether we affirm or reverse. I suppose that it is theoretically conceivable that someone who does not read this court's opinion will learn independently that Cowan was resentenced, and that this person will conclude that resentencing must have occurred because the *ex parte* conversation was found to be improper, and therefore develop renewed confidence in the judiciary. I suggest, though, that this eventuality is far too remote to warrant vacating the sentence. I really do not think that we should be remanding cases on the basis of such speculative and illusory possibilities.